[No. S072946. June 12, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE GONZALEZ, Defendant and Appellant.

## COUNSEL

Michael B. McPartland, under appointment by the Supreme Court; and Carl Gonser for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

CHIN, J.—A jury convicted defendant Jose Gonzalez of the first degree murders of Jose Albert Rodriguez and Hector Ricardo Gonzalez Martinez and of being a felon in possession of a firearm. (Pen. Code, §§ 187, 12021, subd. (a)(1).)[1] It found true the special circumstance of multiple murder and that defendant personally used a firearm in the commission of the murders. (§§ 190.2, subd. (a)(3), 12022.5, subd. (a).) That jury was unable to reach a penalty verdict. After a penalty retrial, a second jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm defendant's convictions and the special circumstance finding, but reverse the death sentence.

### I. THE FACTS

#### A. Guilt Phase

##### 1. Prosecution Evidence

During the evening of June 17, 1996, seven men—Jose Gutierrez, Juan Pablo Rocha, brothers Mario, Juan, and Oracio Jimenez, and victims Jose Albert Rodriguez and Hector Ricardo Gonzalez Martinez—were working on a car in the driveway of the Jimenez brothers' house at 835 North Cordova Avenue, in an area of East Los Angeles that the Lopez Maravilla street gang claimed as its home "turf." At some point, a man, identified as defendant, fired two shots from a rifle towards the men, hitting Rodriguez and Martinez. Both Rodriguez and Martinez died of single gunshot wounds to the body. Defendant was a member of a street gang, the Lott Stoners 13, that was a rival of the Lopez Maravilla gang. He had "Lott 13" tattooed on his neck and, at least by the time of trial, also on the back of his head.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The prosecution presented two kinds of evidence that defendant was the gunman: (1) eyewitness identifications that were, with one exception, repudiated at trial; and (2) evidence, also repudiated at trial, that defendant told a fellow gang member that he was the shooter.

Juan Rocha identified defendant as the gunman at trial. He had previously selected defendant's photograph from a photographic lineup and then defendant himself from a live lineup.

Oracio Jimenez selected defendant's photograph from a photographic lineup and then identified defendant from a live lineup as the gunman. At the live lineup, he said he was "100 percent sure" of his identification. He did not identify anyone at the preliminary hearing or at trial. At the preliminary hearing, he said that he was "terrified" and therefore would not identify anyone in court. At trial, he said that defendant was not the gunman, but he also said that he did not know what the gunman looked like. He said he had selected defendant's photograph because everyone was saying it was No. 2 (defendant's photograph), and he had identified defendant at the live lineup because defendant had a gang tattoo on the back of his head.

Mario Jimenez selected defendant's photograph from a photographic lineup as "look[ing] the most like the guy with the gun." At trial, he identified no one as the gunman. He said he had lied when he selected defendant's photograph as looking like the gunman, and he had done so only because of what others had told him. He could not remember who these others were. When he selected the photograph, he told the police that he had not spoken to anyone about the photographs.

Jose Gutierrez selected defendant's photograph from a photographic lineup as "look[ing] like the one that had the gun." Later, he identified defendant from a live lineup as the gunman. He wrote that he was "100 percent sure" of this identification. At trial, he said he did not get a good look at the gunman, and he did not identify anyone. He said that he had selected defendant's photograph "based on rumors" from "people in the street," whose identity he could not remember. He said he had identified defendant at the live lineup because defendant had a gang tattoo on the back of his head. He had testified at a pretrial hearing that defendant was not the gunman. Los Angeles County Sheriff's Detective Martin Rodriguez, the investigating officer, testified that after Gutierrez so testified at the pretrial hearing, Gutierrez looked in defendant's direction and winked. Gutierrez denied winking at defendant.

Juan Jimenez never identified anyone as the gunman.

Homero Cardenas, like defendant a member of the Lott Stoners 13 gang, told the police in a taped statement that defendant had told him that he,

defendant, had committed the murders. On direct examination at trial, Cardenas acknowledged telling police this, but he said that, in fact, defendant did not tell him who committed the murders. He also said that it was hard for him to testify because he "might feel something might happen to me after" his testimony. The next day, on redirect examination, Cardenas testified that defendant did tell him that he was the gunman. Then, on recross-examination, he changed his testimony again. He said that he had just lied on redirect examination, and that his testimony the day before (that defendant had not admitted being the gunman) was the truth.

The police seized a .223-caliber Armalite rifle from under a house in Los Angeles. Evidence indicated that the Lott Stoners 13 gang used the house to store weapons. Ballistics analysis established that two bullet casings that the police recovered from in front of the Jimenez residence after the shooting came from that rifle.

At the time of the shooting, none of the seven men who were at the Jimenez house were members of a gang. Sometime after he identified defendant at the live lineup, and before he testified at trial, Gutierrez became a member of the Lopez Maravilla gang. Gutierrez testified that the Lopez Maravilla gang and the Lott Stoners 13 gang do not get along.

Sergeant Al Garcia testified as an expert on street gangs in East Los Angeles. The gangs are concerned about their "turf"—the areas in which they are located. The Lott Stoners 13 gang and the Lopez Maravilla gang claimed turfs that were divided by a common street. The two gangs were "bitter enemies" that often assaulted each other. In gang culture, it was bad to be a "rat" or a "snitch," i.e., someone who assisted law enforcement as a witness or an informant. Sergeant Garcia testified that such persons are often intimidated not to testify. It does not matter whether a person provides information against a fellow gang member or a rival gang member. Either way, the person is considered to be assisting law enforcement and might be intimidated. Sergeant Garcia also testified that, in his experience, a member of the Lott Stoners 13 gang would not falsely tell police that a fellow Lott Stoners 13 gang member had committed a crime.

The parties stipulated that defendant had a prior felony conviction.

### 2. *Defense Evidence*

Defendant presented evidence that the police first received a call about the shooting at 8:49 p.m., on June 17, 1996, and that, based on the time of the call, the incident itself occurred around 8:45 p.m. Edwin Krupp, an astronomer, testified that in Los Angeles on June 17, 1996, sunset occurred at

8:06 p.m. That night, the end of "evening civil twilight," meaning "the time that we generally say it is dark," was 8:35 p.m. A person would not notice any difference between the lighting at 8:35 p.m. and 8:45 p.m. The presence or absence of artificial light would affect how a person could see at that time.[2]

Dr. Walter Fierson testified about defendant's impaired vision. Defendant has only one functioning eye. His uncorrected vision in that eye was 20/60. George Little, a defense investigator, testified about an interview he and defense counsel had with Juan Rocha, the witness who consistently identified defendant as the shooter.

Diana Alvarado, defendant's longtime girlfriend, testified that defendant was with her all day on June 17, 1996. The two arrived at defendant's home around 7:30 that evening and were joined by Maria Velasco and another person. Around 9:00 p.m., the other two left, but Alvarado stayed with defendant until sometime after 10:00 p.m.

Maria Velasco testified that she and a friend were with defendant and Alvarado the evening of June 17, 1996, until she and the friend left sometime around 9:00 to 9:30 p.m. She saw Alvarado often after June 17, 1996, but the first time Alvarado told her about defendant's arrest for a crime committed before 9:00 p.m. on that day was in September 1996.

### 3. *Rebuttal*

Detective Rodriguez testified that he spoke with defendant on July 9, 1996, about his activities on June 17, 1996. Defendant said that Alvarado dropped him off at his home at 8:00 p.m. that day. He never mentioned being with Maria Velasco that day.

### B. *Penalty Phase*

### 1. *Prosecution Evidence*

Because the penalty verdict before us was decided by a different jury than the one that decided guilt, the prosecution presented evidence of the circumstances of the crimes of this case. In addition, it presented evidence that on August 22, 1995, while he was a passenger in a vehicle, defendant possessed a loaded assault pistol. As a result, defendant was convicted of possessing an assault weapon. It also presented evidence that on two separate occasions while incarcerated awaiting trial in this matter, defendant assaulted a fellow

---

[2] Oracio Jimenez had testified during the prosecution case-in-chief that a street light was on that evening "a little bit to the left, right across the street."

inmate. A week after the second assault, defendant was searched after he got off a jail bus and before he was returned to his jail cell. Hidden in the crotch of his pants was a three-inch piece of metal wrapped in cloth commonly used as a stabbing instrument and described as a "jail house shank."

Maria and Elizabeth Rodriguez, sisters of victim Rodriguez and cousins of victim Martinez, testified about the victims and the impact their deaths had on the witnesses and other family members.

### 2. *Defense Evidence*

In an attempt to create a lingering doubt about his guilt for the murders, defendant presented testimony of Oracio Jimenez and Diana Alvarado that was similar to their guilt phase testimony. Jimenez testified that at the time of the shooting it was getting dark and he did not get a good look at the gunman.

Blanca Gonzalez, defendant's mother, testified that defendant is blind in his left eye and cannot hear in his left ear, as a result of a street beating when he was 16 years old. She believes he does not deserve to be put to death.

## II. Discussion

### A. *Guilt Phase*

#### 1. *Denial of Motion to Suppress Identification Evidence*

Before trial, defendant moved to suppress the pretrial identifications on the basis that the photographic and live lineups were impermissibly suggestive. The court denied the motion after an evidentiary hearing. Defendant contends the court erred.

" 'In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) "whether the identification procedure was unduly suggestive and unnecessary," and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 366–367 [63 Cal.Rptr.2d 1, 935 P.2d 708].) "The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 [108 Cal.Rptr.2d 291, 25 P.3d 519].) The trial court found neither the photographic nor the live lineup unduly suggestive. We agree. Accordingly, we need not consider whether the identifications were nevertheless reliable.

We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608–609 [31 Cal.Rptr.3d 160, 115 P.3d 472].)

The photographic lineup here contained photographs of six different persons, including defendant. Defendant claimed at trial that this lineup was impermissibly suggestive because (1) he was the only one wearing "gang-type" clothing, (2) he "ha[d] a droopy eye in the photo," and (3) his photograph was discolored. The trial court disagreed. It found "nothing about any of the photographs, individually or taken together as a whole, that would suggest that the defendant's picture . . . be picked over the others." After viewing the lineup, we agree. "Because human beings do not look exactly alike, differences are inevitable. The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter, supra,* 15 Cal.4th at p. 367.) Here, nothing in the lineup suggested that the witness should select defendant. As the trial court found, nothing about defendant's clothing suggested his photograph should be selected. We cannot discern any significant distinctiveness about defendant's eye. In any event, none of the witnesses described the gunman as having a distinctive eye, so any distinctiveness in the photograph would not suggest the witness should select that photograph. Moreover, "it would be virtually impossible to find five others who had" a similar eye "and who also sufficiently resembled defendant in other respects." (*Ibid.*) Finally, any discoloration in defendant's photograph would not suggest it should be selected.

Defendant claims the live lineup was suggestive because only he had a Lott Stoners 13 tattoo on the back of his head. He argues that the lineup officials should have covered the tattoo so that the witnesses could not see it. Evidence at the evidentiary hearing indicates that the witnesses could observe the tattoo when defendant turned to the right and left, and when he walked along the platform. In claiming this circumstance rendered the live lineup impermissibly suggestive, defendant relies in part on the testimony of Jose Gutierrez, who testified (as he would later testify at trial) that he identified defendant because of the tattoo. However, the trial court expressly found Gutierrez not credible. It noted for the record that when Gutierrez testified at the hearing that he could not identify defendant, "he winked with his left eye at [defendant], which the court observed." Based on this wink, which it viewed as Gutierrez "saying to the defendant, I'm following the rules of the jail and the street and I'm not going to become a snitch on you in the courtroom," and Gutierrez's general courtroom demeanor, the court found that Gutierrez was "not testifying truthfully as to his repudiation of earlier identifications he made of the defendant from the photographs and lineup."

We accept this credibility determination. (*People v. Barnes* (1986) 42 Cal.3d 284, 303–304 [228 Cal.Rptr. 228, 721 P.2d 110].)

In any event, defendant's tattoo did not make the live lineup impermissibly suggestive. None of the witnesses observed a tattoo on the gunman's head. Neither before nor at the live lineup did any witness suggest to any of the authorities conducting the lineup that a tattoo was or might be relevant to his identification. It was only *after* the lineup, when some of the witnesses repudiated their identifications, that they first said the tattoo was significant. Under the circumstances, the tattoo did not itself suggest that defendant should be selected, and the failure to cover it did not render the procedure impermissibly suggestive. Whether the witnesses were truthful when they identified defendant or when they later repudiated those identifications presented credibility questions for the jury to resolve. But presenting the evidence to the jury for its resolution did not violate defendant's rights.

### 2. Admission of Testimony of Gang Expert

Sergeant Al Garcia testified as an expert on street gangs in East Los Angeles. Defendant objected to some of the testimony on various grounds. The court sustained some of the objections and maintained control over the nature and extent of the expert testimony, but it also overruled many of the objections. Defendant contends the court erred in several regards.

In general, this court and the Courts of Appeal have long permitted a qualified expert to testify about criminal street gangs when the testimony is relevant to the case. "Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*Id.*, subd. (a).) The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713]; see also *People v. Ochoa* (2001) 26 Cal.4th 398, 438 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506 [68 Cal.Rptr.2d 135]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 [37 Cal.Rptr.2d 596] ["The use of expert testimony in the area of gang sociology and psychology is well established."].) "Trial courts exercise discretion in determining both the admissibility of evidence under Evidence Code section 352 [citation] and a witness's expert status [citation]." (*People v. Ochoa*, *supra*, at p. 437.) As we explain, the court acted within its discretion in this case.

At one point, the prosecutor asked the witness, "Assuming a member of Lopez Maravilla was called to testify against a rival gang member, a Lott

Stoner, do you have an opinion as to whether or not there would be intimidation against the gang member who was called to testify by his own gang as well as any other gang?" The court overruled defendant's objection, and the witness answered, "Definitely." The witness further testified that the person's own gang as well as the rival gang would be doing the intimidating. The prosecutor then asked, "Assuming that a member of Lott Stoners was called to testify in a case involving a Lott Stoner as a defendant, do you have an opinion as to whether or not there would be intimidation from the Lott Stoners gang to the witness?" The court overruled defendant's objection, and the witness said, "That witness'[s] safety would be in great jeopardy." Defendant objected again. The court and parties conferred outside the hearing of the jury, after which the court permitted the witness to testify that, assuming a member of the Lott Stoners 13 gang was called to testify against a fellow gang member, there would be intimidation by the gang members. On further questioning, the witness testified that this opinion was based on his experience at the "East L.A. station." He elaborated, "What happens is that every morning I review all reports. I have six investigators that work for me, and a lot of times they prep me on any incidents of witness intimidations. Many times we have had to go to court because of intimidation of witnesses and provide security. Also, there was one incident where a gang member who assisted in an investigation was murdered by his own gang for cooperating with law enforcement." At this point, defendant objected and moved to strike the testimony and for a mistrial. After another hearing at the sidebar, the court overruled the objection and mistrial motion.

Regarding this testimony, defendant argues that the court erred in permitting Sergeant Garcia "to make unqualified assertions about how all relevant gang members would behave in a particular set of circumstances." The Attorney General argues that to the extent defendant bases this argument on the fact that the witness used the word "definitely," the claim is not cognizable because defendant failed to object to that word and move to strike it. We disagree. Although a party must object on the specific ground asserted on appeal (Evid. Code, § 353, subd. (a)), defendant's many objections, both before the witness testified and during the actual testimony, made reasonably clear he was objecting on grounds that included those raised on appeal. On the merits, however, we find no abuse of discretion.

■ This testimony was quite typical of the kind of expert testimony regarding gang culture and psychology that a court has discretion to admit. Whether members of a street gang would intimidate persons who testify against a member of that or a rival gang is sufficiently beyond common experience that a court could reasonably believe expert opinion would assist the jury. "It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect.' " (*People v. Olguin, supra*, 31 Cal.App.4th at p. 1384; accord, *People v.*

*Gonzalez* (2005) 126 Cal.App.4th 1539, 1551 [25 Cal.Rptr.3d 124].) Sergeant Garcia's testimony was relevant to help the jury decide which version of the testimony was truthful: the eyewitnesses' initial identifications of defendant as the shooter, and Cardenas's initial statement that defendant admitted being the shooter, or the later repudiations of those identifications and that statement. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1]; see also *People v. Ward* (2005) 36 Cal.4th 186, 211 [30 Cal.Rptr.3d 464, 114 P.3d 717].) Evidence of possible intimidation would help explain why the witnesses might repudiate earlier truthful statements. Contrary to defendant's argument, the fact that the witness used the word "definitely" in response to a question whether he had an opinion on this matter does not make the testimony inadmissible. Opinions that are otherwise admissible are not made inadmissible merely because they are definite.

Relying primarily on *People v. Killebrew* (2002) 103 Cal.App.4th 644 [126 Cal.Rptr.2d 876], defendant argues that Sergeant Garcia did not merely testify about "gang customs or habits in general" but improperly testified "that the witnesses *were* being intimidated, not just that they *may* be intimidated by other gang members." As did the court in *People v. Gonzalez, supra,* 126 Cal.App.4th 1539, we read *Killebrew* as merely "prohibit[ing] an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial." (*People v. Gonzalez, supra,* at p. 1551; see also *People v. Ward, supra,* 36 Cal.4th at pp. 209–210.)[3] Even if we assume, without deciding, that *Killebrew* is correct in this respect, it has no relevance here. Sergeant Garcia merely answered hypothetical questions based on other evidence the prosecution presented, which is a proper way of presenting expert testimony. "Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' " (*People v. Gardeley, supra,* 14 Cal.4th at p. 618; see also *People v. Gonzalez,*

---

[3] *People v. Killebrew, supra,* 103 Cal.App.4th 644, is somewhat unclear in this regard. Although its legal discussion states that the expert "informed the jury of his belief of the suspects' knowledge and intent on the night in question," its factual account states that "[t]hrough the use of hypothetical questions, Darbee [the expert] testified that each of the individuals in the three cars" had certain knowledge and intent. (*Id.* at p. 658.) The opinion never specifically states whether or how the expert referred to specific persons, rather than hypothetical persons. Obviously, there is a difference between testifying about specific persons and about hypothetical persons. It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons. As explained in *People v. Gonzalez, supra,* 126 Cal.App.4th at page 1551, footnote 4, use of hypothetical questions is proper.

*supra*, at p. 1551, fn. 4.) The witness did not express an opinion about whether the particular witnesses in this case had been intimidated. (See also *People v. Olguin, supra,* 31 Cal.App.4th at p. 1371 [permitting expert testimony that "focused on what gangs and gang members typically expect and not on [one of the defendant's] subjective expectation in this instance"].)

It is true that Sergeant Garcia's opinion, if found credible, might, together with other evidence, lead the jury to find the witnesses were being intimidated, which in turn might cause the jury to credit their original statements rather than their later repudiations of those statements. But this circumstance makes the testimony probative, not inadmissible. (*People v. Gonzalez, supra,* 126 Cal.App.4th at p. 1551 ["This evidence, coupled with the evidence that appellant was a gang member, may have led the jury to the ineluctable conclusion that appellant intended to kill Cruz, but that does not render it inadmissible."].) "The law does not disfavor the admission of expert testimony that makes comprehensible and logical that which is otherwise inexplicable and incredible." (*Ibid.*)

Defendant also argues that the trial court erroneously allowed Sergeant Garcia "to opine on whether or not the witnesses against [him] were telling the truth." He bases this argument partly on the evidence regarding gang intimidation discussed above and partly on the witness's testimony that, because aiding law enforcement would cause one to be labeled a "rat" or "snitch," a gang member would not lie to the police when implicating a fellow gang member in a crime. He particularly challenges the witness's testimony that, in his experience and training, he had never known a gang member, including a member of the Lott Stoners 13 gang, "to lie about a fellow gang member making him a rat or a snitch." He argues that this testimony was an impermissible opinion on the credibility of a particular witness. We disagree. Sergeant Garcia was not asked, and did not testify about, any particular witness in this case. He merely provided expert testimony regarding gangs in general. It was up to the jury to determine how much to credit this testimony and, if it found it credible, to apply it to the rest of the evidence it heard. Again, it is true that this testimony, if found credible, might, together with other evidence, lead the jury to find that the witnesses' original statements incriminating defendant were truthful. But this circumstance does not render the testimony inadmissible.

Finally, defendant contends the court erred in denying a trial motion to strike Sergeant Garcia's testimony. The issue arose in the following context. On cross-examination, defense counsel elicited from Sergeant Garcia that his expert opinion rested in part on information he had "received in the street." Then came this colloquy (questions by defense counsel, answers by Sergeant Garcia):

Question: "And you would tell us that the people that you spoke with have consistently given you truthful and accurate information which you used to form the basis of your expert opinion?"

Answer: "Not always."

Question: "You can't tell when you are getting truthful, accurate information, can you?"

Answer: "No."

Question: "You don't know if someone is lying or perhaps even making a mistake when you get information from them, let us [*sic*] alone if it was truthful, true?"

Answer: "That is true, somewhat."

Question: "So sometimes even errors or mistakes can be the basis of misinformation as well as lies, because it is a human thing, would you agree?"

Answer: "That is correct."

Later, outside the presence of the jury, defendant moved to "disqualify [Sergeant Garcia] as an expert in the area of gangs." The court denied the motion.

Defendant contends the court erred. He correctly notes that expert testimony must be based on "material of a type that is reasonably relied upon by experts in the particular field in forming their opinions." (*People v. Gardeley*, *supra*, 14 Cal.4th at p. 618.) He argues that because of Sergeant Garcia's admissions, quoted above, his testimony was based on unreliable material. The Attorney General argues, first, that defendant has forfeited the issue. We agree in part. Defendant did not object that Sergeant Garcia's testimony was based on unreliable material at any time before he finally moved to disqualify him as an expert. Indeed, before the witness testified, defense counsel told the court that he might challenge Sergeant Garcia's expert qualifications by cross-examination in front of the jury (as he later did), but he would not "raise it as an issue that the court will have to deal with as to the qualifications." Accordingly, although the record contains some information regarding Sergeant Garcia's qualifications as an expert, it is not necessarily complete in this regard. Because defendant did not challenge Sergeant

Garcia's qualifications at trial, he may not do so on appeal. (*People v. Williams* (1997) 16 Cal.4th 153, 194 [66 Cal.Rptr.2d 123, 940 P.2d 710].)[4]

All that remains of the current claim is whether the cross-examination that defendant cites, by itself, required the court to disqualify the witness. It did not. Sergeant Garcia merely admitted the obvious—that people "in the street" sometimes lie. But he never said that he based his opinion solely on unreliable information. Indeed, Sergeant Garcia also testified that his opinion was not based on information from a single person but on "corroborative information from other citizen informants, other evidence that we have at hand, reports, people from the community." A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable. (*People v. Gardeley, supra*, 14 Cal.4th at p. 620.) We see no abuse of discretion in the court's refusal to strike the testimony.

### 3. *Admission of a Photograph of the Crime Scene*

Over objection, the court admitted a photograph of the crime scene. Defendant argues the court erred because the photograph was based on inadmissible hearsay and was misleading.

At a hearing outside the presence of the jury, Detective Rodriguez, the investigating officer, testified that in the photograph he was standing where Oracio and Mario Jimenez had told him the gunman was standing. Previously, when shown that photograph, Oracio had testified the gunman was in a different location, then he said he was "not sure" where the gunman was in relation to where a person in the photograph (presumably Detective Rodriguez) was standing. Mario testified that the gunman was standing in the street, a different position than in the photograph.

Defendant argues that the previous statements of Oracio and Mario were hearsay. However, prior inconsistent statements of a witness are admissible as an exception to the hearsay rule. (Evid. Code, §§ 770, 1235; *People v. Sapp* (2003) 31 Cal.4th 240, 296 [2 Cal.Rptr.3d 554, 73 P.3d 433].) Defendant claims the previous statements were not inconsistent because at trial the

---

[4] The record indicates that Sergeant Garcia had previously qualified as an expert on East Los Angeles gangs "numerous times in court." He had been a deputy sheriff for 21 years, all of which were spent working with gangs. He had been the "head" of "operation safe street," a "gang unit" in East Los Angeles, for five years. He had "extensive[]" experience dealing with gangs in East Los Angeles. "I go out in the field and do proactive work. I talk to a lot of gang members. I lecture to different community organizations regarding gang activity within the Los Angeles area. I have attended . . . seminars presented by the California gang investigator's association." Even had there been an objection, this testimony alone would seem to make Sergeant Garcia well qualified as an expert on East Los Angeles street gangs. (Cf. *People v. Williams, supra*, 16 Cal.4th at p. 195.)

witnesses merely said they could not remember where the gunman was standing. The witnesses did claim lack of memory on a number of occasions, but they also gave clearly inconsistent testimony. Moreover, to the extent a claimed lack of memory amounts to deliberate evasion, as the court could readily have found here, inconsistency is implied. (*People v. Sapp, supra,* at p. 296.) Defendant's hearsay objection lacks merit.

██ Defendant also contends the court should have excluded the photograph as irrelevant and, if relevant, unduly prejudicial under Evidence Code section 352 because it was misleading in three respects: (1) the location of the photographer was unknown; (2) Detective Rodriguez was taller than the gunman; and (3) the photograph was taken with a flash so it did not show the actual lighting conditions. "The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value." (*People v. Horning* (2004) 34 Cal.4th 871, 900 [22 Cal.Rptr.3d 305, 102 P.3d 228].) Here, the court carefully exercised its discretion. Detective Rodriguez testified that the photographer was standing behind a certain car, although he was not sure exactly where. As the trial court noted, the photograph was offered to show where the witnesses had said the gunman was standing. It was clearly probative on this point even if the exact position of the photographer was not known. It was not offered to show the height of the gunman or the lighting conditions. The court invited defense counsel to cross-examine Detective Rodriguez on these points, and he did. The jury learned of, and could readily understand, the differences between the photograph and the crime scene. Hence, the court acted within its discretion in admitting the photograph as illustrating where the witnesses placed the gunman. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1114–1115 [36 Cal.Rptr.2d 235, 885 P.2d 1] [inaccuracies in a videotape, including different lighting conditions, did not make it inadmissible].)

### 4. *Refusal to Exclude the Investigating Officer from the Courtroom*

Before Homero Cardenas testified, defendant moved to exclude Detective Rodriguez from the courtroom during that testimony because Detective Rodriguez had previously interviewed Cardenas. When the district attorney stated that Detective Rodriguez was his investigating officer, the court denied the motion.

██ Defendant contends the court erred. It did not. Evidence Code section 777, subdivision (a), permits the court to exclude witnesses from the courtroom, but subject to subdivisions (b) and (c) of that section. Subdivision (b) prohibits the court from excluding a "party to the action." Subdivision (c) provides, "If a person other than a natural person is a party to the action, an

officer or employee designated by its attorney is entitled to be present." The word "person" includes a "public entity" (Evid. Code, § 175) such as the People of the State of California. Therefore, the deputy district attorney, the attorney for the People, could designate an officer or employee who was "entitled to be present." The deputy district attorney designated Detective Rodriguez. Accordingly, Detective Rodriguez was entitled to be present. (*People ex rel. Curtis v. Peters* (1983) 143 Cal.App.3d 597 [192 Cal.Rptr. 70] [excluding the People's investigating officer was prejudicial error].)

Defendant claims that not excluding Detective Rodriguez violated various of his constitutional rights. In effect, he argues that Evidence Code section 777, subdivision (c), is unconstitutional as applied to him. He cites no authority for this proposition, and we are aware of none. Just as defendant himself, a party to the action, was entitled to be present to assist his attorney, so, too, was the prosecutor entitled to the presence of an investigating officer. The fact that Detective Rodriguez had interviewed Cardenas does not change this. Investigating officers often interview witnesses.

### 5. *Alleged Exclusion of a Prior Statement of a Defense Witness*

During the redirect examination of the defense alibi witness Maria Velasco, defense counsel questioned her about a statement dated September 11, 1996, that she had apparently written. Outside the presence of the jury, the district attorney objected that he had not been provided discovery of the statement in violation of discovery rules. Defense counsel claimed he had provided the statement. After further discussion, the court said that "until the problem is solved . . . I am going to order that no reference be made to the statement." A short time later, the court reiterated, "I am going to order at least for the time being that no reference be made to that document." The witness was then excused but ordered to remain on call. Defendant never again sought to use the statement.

Defendant contends the court erred "when it refused to allow [him] to present evidence of a prior consistent statement by defense witness Maria Velasco." However, the court did not refuse to permit defendant to present the evidence. It merely ordered use of the statement be postponed pending resolution of the discovery problem. Doing so was within the court's discretion. "A trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice." (*People v. Cox* (1991) 53 Cal.3d 618, 700 [280 Cal.Rptr. 692, 809 P.2d 351]; see Pen. Code, § 1044; Evid. Code, § 765.) Nothing prevented defense counsel from attempting to use the statement later. We do not know why counsel chose to drop the matter rather than bring it up again, but we see no error of which defendant can complain. Moreover, the statement was brief and consistent

with Velasco's trial testimony. The fact that Velasco said the same thing in September 1996, approximately three months after the crime, would not have significantly added to her credibility. We see no prejudice even if we were to assume that the court should have allowed defendant to question Velasco about it from the beginning.

### 6. *Exclusion of a Videotape of the Crime Scene*

Defendant sought to admit a videotape of the crime scene. After viewing the videotape and hearing evidence, the court excluded it. Defendant contends the court erred. We disagree.

Defendant offered the videotape solely to show the lighting conditions at the time of the shooting. In making its ruling, the court reviewed the evidence on this question. One defense expert witness testified that the minimum amount of light necessary for a video camera to record is 1.8 lux, but that the human eye can see with even less than that amount of light. As the court noted, the witness further testified that the human eye is able to see things in the dark better than a video camera regardless of the lux lighting. Based on evidence presented at the evidentiary hearing, the court also noted other differences between the videotape and the actual lighting conditions at the time of the crime. It said that "[b]ecause the purpose of the film is to demonstrate to the jury the lighting conditions, I have come to the conclusion that there are too many differences in this case for a proper foundation to meet the test." It found that "because of the number of differences and dissimilarities in what took place on June 5, 1997 [the day the videotape was made], I have great fear that the jury is going to be misled." It concluded, "Based on the testimony and the perceived differences, as well as the inability of the camera to recreate accurately the ability of the human eye under the same or similar circumstances, that this videotape will mislead the jury, and I am going to find that [the] foundation has not been sufficiently made and order it to be excluded."

■ "To be admissible in evidence, an audio or video recording must be authenticated. [Citations.] A video recording is authenticated by testimony or other evidence 'that it accurately depicts what it purports to show.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 747 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them." (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1114.) Unlike the photograph of the crime scene discussed in part II.A.3., *ante,* which reasonably portrayed that for which it was offered—to illustrate where some of the

witnesses had said the gunman was standing—the videotape did not portray that for which it was offered—to show the actual lighting conditions at the time of the crime. "The trial court reasonably concluded that the lighting conditions portrayed on the film were not sufficiently similar to the lighting conditions on the night of the crime. We find no abuse of discretion." (*People v. Boyd* (1990) 222 Cal.App.3d 541, 566 [271 Cal.Rptr. 738].) In short, the court acted within its discretion when it excluded a videotape offered to show the lighting conditions at the time of the shooting because it did not accurately show those lighting conditions.

### B. *Penalty Phase*

Defendant raises several penalty issues. We agree with his contention that the prosecution's failure to provide discovery of its rebuttal evidence requires reversal of the death sentence. Accordingly, we do not discuss the remaining contentions.

### 1. *Factual Background*

At the first penalty trial, Father Gregory Boyle testified for the defense in mitigation. In response to a hypothetical question, he testified that a man about 20 years of age, who was a member of the Lott Stoners 13 gang, and had been convicted of murder and sentenced to prison for life, was capable of changing. In rebuttal to this and other mitigating evidence, the prosecutor sought to present three items of evidence: defendant's 1996 conviction for "unlawful driving or taking of a vehicle," and the testimony of Detective Rodriguez (the investigating officer) and Sheriff's Deputy John Brooks. Detective Rodriguez and Deputy Brooks testified as an offer of proof outside the presence of the jury. Deputy Brooks testified that at one point during the guilt phase of trial, defendant told him, "in a low voice," that "after his guilty verdict came in he was going to get me." Detective Rodriguez testified that on the day of the guilt verdict, defendant commented as he walked by Rodriguez's table, "Here comes a killer." Later that day, after the guilt verdict, defendant walked past him and "turned his head, looked at me and said, 'You're next.' " After hearing the offer of proof and the arguments of counsel, the court excluded Deputy Brooks's testimony, finding it more prejudicial than probative. But it admitted Detective Rodriguez's testimony as well as the 1996 conviction for taking a vehicle.

During the second penalty phase, after the prosecutor presented its case in aggravation, the parties requested the court to hold a hearing outside the jury's presence regarding the admissibility of two witnesses the defense contemplated presenting in mitigation: Father Boyle and Father George Horan. Defense counsel stated that he had given the prosecutor in discovery a

copy of Father Horan's statement, and that the prosecution already knew about Father Boyle's testimony from the first trial. Later, defense counsel made an additional offer of proof as to these witnesses. Later still, Father Horan testified outside the jury's presence as an additional offer of proof.

Father Horan testified that he is a Catholic priest with considerable experience working with jail and prison inmates. He testified about programs in prison that can rehabilitate inmates. He also testified that he had seen "tremendous changes" among inmates who face execution or life sentences. Additionally, he testified about defendant himself. He felt that defendant could change for the better in prison. Defendant offered Father Horan as "an expert who is familiar with change and the possibility of change in the prison." The court limited the scope of Father Horan's testimony in certain respects, but it ruled that Father Horan could testify about defendant personally and also as an expert regarding inmates under a sentence of death or life without the possibility of parole.

At the hearing, the parties and court also discussed the nature of rebuttal evidence the court might permit if defendant presented this mitigating evidence. At one point, the prosecutor stated that under section 190.3, he did not have to inform defense counsel "what type of rebuttal evidence I intend to put on in the penalty phase." Defense counsel disagreed. He argued that it appeared the prosecutor was saying that the trial was "a crap shoot," and that "[w]e [the People] won't tell you what we have, but you have to tell us what you have and what you know." He explained, "I am expected to make decisions that have an effect on my client's life or death . . . without knowing or having a clue as to whether the People have any witnesses or don't have any witnesses or what it goes to." He asked "that the court require of the People to make an offer of proof as to any rebuttal evidence that they may have so we can make an informed decision as to what to put on at this phase of the defendant's case." As authority, counsel cited "the fundamental fairness in the criminal justice system" and the defendant's "opportunity to have a fair trial." When the prosecutor continued to argue that under section 190.3, he did not have to provide discovery of rebuttal evidence, defense counsel responded that any such interpretation of that section would make it unconstitutional. Counsel also argued that "a fair reading of [section] 190.3 is that they don't have to do it [provide discovery of rebuttal witnesses] prior to trial because . . . the other material was supposedly disclosed well in advance of trial, but we're in trial. We're in the penalty phase. We're right up to the point where the People are going to have to fish or cut bait. Do you have anything or not? And I think by now they should be required to disclose."

Citing section 190.3, the court denied defendant's request to order the prosecution to provide discovery of its intended rebuttal evidence. After

further discussion, defense counsel requested and was granted a moment to confer with his cocounsel. After an off-the-record conference with cocounsel, defense counsel stated that "I have decided to do what I feel best in the case, and that is not to call Father Horan." Neither Father Horan nor Father Boyle testified in mitigation.

## 2. *Analysis*

Defendant contends the court prejudicially erred in not requiring the prosecutor to provide discovery of what evidence it intended to present in rebuttal to the proffered testimony of Father Boyle or Father Horan. We agree.

The fourth paragraph of section 190.3, the provision on which the prosecutor and court relied in refusing to provide or require discovery of intended rebuttal evidence, requires the prosecution to provide pretrial notice to the defendant of the evidence it intends to introduce in aggravation at the penalty phase of a capital trial. That paragraph also states, however, "Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." Thus, rebuttal evidence is not subject to the advance notice requirement of section 190.3. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1072–1073 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) But this does not mean that the prosecutor never has to provide discovery of its intended penalty phase rebuttal evidence.

The trial of this case was governed by section 1054 et seq., adopted as part of Proposition 115 in 1990, which generally provides for reciprocal discovery in criminal cases. (See *Izazaga v. Superior Court* (1991) 54 Cal.3d 356 [285 Cal.Rptr. 231, 815 P.2d 304] (*Izazaga*).) These discovery provisions and section 190.3 concern different matters. Section 190.3 provides for *pretrial notice*, not discovery. Its fourth paragraph requires only that "notice of the evidence to be introduced [be] given to the defendant within a reasonable period of time as determined by the court, prior to trial." "The statute does not require production of the evidence, however, but notice of it." (*People v. Roberts* (1992) 2 Cal.4th 271, 330 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Thus, the notice provision permits the defense to know what incidents will be used against it at trial, but it does not itself provide for, or preclude, discovery. The discovery provisions coexist with this notice provision. The fact that the failure to provide pretrial notice of rebuttal evidence does not preclude its admission (§ 190.3) does not make rebuttal evidence exempt from ordinary rules of discovery. We must give effect to both section 190.3 and the discovery provisions.

In *Izazaga, supra,* 54 Cal.3d 356, we interpreted Proposition 115's discovery provisions and upheld them against constitutional challenge. One

of the arguments against its constitutionality that we addressed at length was that, although the statutory scheme required the defense to provide to the prosecution discovery regarding persons (other than the defendant) that it "intends to call as witnesses at trial" (§ 1054.3, subd. (a)), it did not require the prosecution to provide similar discovery regarding persons it intended to call *in rebuttal.* We recognized that the United States Supreme Court had held that "when the prosecution is allowed discovery of the defense, that discovery must be reciprocal. [(Citing *Wardius v. Oregon* (1973) 412 U.S. 470, 474 [37 L.Ed.2d 82, 93 S.Ct. 2208].)] In *Wardius* the Supreme Court held that under the due process clause, a criminal defendant cannot be compelled by discovery procedures to reveal his alibi defense in the absence of fair notice that he would have the opportunity to discover the prosecution's rebuttal witnesses." (*Izazaga, supra,* at p. 373.) Accordingly, "[t]he due process clause requires notice that the defendant will have the opportunity to discover the prosecutor's rebuttal witnesses." (*Id.* at p. 375.)

We "conclude[d] that the new discovery chapter affords defendants sufficient rights of reciprocal discovery to meet the requirements of the due process clause." (*Izazaga, supra,* 54 Cal.3d at p. 373.) "Given that the due process clause mandates reciprocity when the prosecution obtains discovery materials from the defense [citation], and given that the new discovery chapter provides for prosecutorial discovery of defense evidence (see Pen. Code, § 1054.1 . . .), it follows that the new discovery chapter should, if possible, be interpreted as providing such reciprocity." (*Ibid.,* fn. omitted.) We noted "that the enumeration of a criminal defendant's discovery rights under section 1054.1 does not *specify* that rebuttal witnesses are included. However, the only reasonable interpretation of the requirement that the prosecution disclose '[t]he names and addresses of persons the prosecutor intends to call as witnesses at trial' [(§ 1054.1, subd. (a))] is that this section includes both witnesses in the prosecution's case-in-chief and rebuttal witnesses that the prosecution intends to call." (*Id.* at p. 375.)

We went on to explain "that the prosecution's right to discover defendant's witnesses under section 1054.3 is triggered by the *intent* of the defense to call that witness. Thus, the disclosure by the defense of its witnesses under section 1054.3 signals to the prosecution that the defense 'intends' to call those witnesses at trial. It follows that the prosecution must necessarily 'intend' to call any of its witnesses who will be used in refutation of the defense witnesses if called. A prosecutor cannot 'sandbag' the defense by compelling disclosure of witnesses the defense intends to call, and then in effect redefining the meaning of 'intends' when it comes time to disclose rebuttal witnesses. The same definition applies to both the prosecution and the defense and thereby assures reciprocity. A disclosure of witnesses under section 1054.3 thus triggers a defendant's right to discover rebuttal witnesses

under section 1054.1, fulfilling the requirement of reciprocity under *Wardius* [*v. Oregon*], *supra*, 412 U.S. 470." (*Izazaga, supra*, 54 Cal.3d at pp. 375–376, fn. omitted.)

*Izazaga, supra*, 54 Cal.3d 356, was not a capital case. But any doubt that the discovery provisions of section 1054 et seq. apply to the penalty phase of a capital trial was dispelled in *People v. Superior Court* (*Mitchell*) (1993) 5 Cal.4th 1229 [23 Cal.Rptr.2d 403, 859 P.2d 102]. In *Mitchell*, the defendant had persuaded the trial court that he did not have to give the prosecution discovery regarding the penalty phase. That court had concluded that "section 190.3, with its specific reference to penalty phase evidence, constituted the sole discovery provision applicable to such evidence." (*Id.* at p. 1232.) We disagreed and directed the trial court to compel reciprocal penalty phase discovery between the prosecution and the defendant. We agreed with the Court of Appeal, which had reached a similar conclusion, that, "[b]ecause section 190.3 does not by its terms prohibit reciprocal discovery, section 1054, subdivision (e), should apply." (*Id.* at p. 1233.) We "conclude[d] that reciprocal discovery is available with respect to penalty phase evidence . . . ." (*Id.* at p. 1231.)

In light of *Izazaga, supra*, 54 Cal.3d 356, and *People v. Superior Court* (*Mitchell*), *supra*, 5 Cal.4th 1229, the prosecution was wrong to refuse to provide reciprocal discovery, and the trial court erred in not requiring it to do so. After defendant provided discovery of its intent to call Father Boyle or Father Horan, or both, in mitigation, the prosecution was obligated to provide reciprocal discovery of "any of its witnesses who will be used in refutation of the defense witnesses if called." (*Izazaga, supra*, 54 Cal.3d at p. 375.) Here, the defense provided very specific and focused discovery of its intended witnesses and specifically requested discovery of any rebuttal evidence. If the prosecutor had any rebuttal he intended to present in the event defendant actually presented the proffered evidence, he was obligated to provide discovery of it.

 The Attorney General makes two arguments why defendant may not raise this issue on appeal, neither convincing.[5] First, he points out that defense counsel argued that "fundamental fairness" entitled him to the discovery, that section 190.3 was unconstitutional if interpreted as denying the discovery, and that a "fair reading" of section 190.3 entitled him to the discovery. However, counsel did not specifically cite the discovery provisions

---

[5] The district attorney did not argue at trial that the discovery request was untimely, the trial court did not find the request untimely, and the Attorney General does not argue on appeal that the request was untimely. Accordingly, we need not consider whether defendant should have requested the discovery sooner than he did. (See *People v. Superior Court* (*Mitchell*), *supra*, 5 Cal.4th at pp. 1237–1239.)

of section 1054 et seq. "Accordingly," the Attorney General argues, "any claim that is not based on these three theories of discovery has been waived by [defendant's] failure to make a timely and specific objection at trial." Defendant's discovery request was reasonably specific. We are unaware of any requirement that a party must cite a specific statute in order to receive discovery to which it is entitled. Unlike the authority the Attorney General cites, this is not a matter of objecting to evidence at trial, but a simple discovery request. Not providing discovery the defense specifically requests merely because defense counsel did not cite the right statute would be inconsistent with the high court's holding "that the due process clause requires 'notice that [the defendant] would have an opportunity to discover the State's rebuttal witnesses.' " (*Izazaga, supra,* 54 Cal.3d at p. 375, quoting *Wardius v. Oregon, supra,* 412 U.S. at p. 479.) In any event, the arguments defense counsel made at trial are sufficient to establish error. As we explained in *Izazaga,* due process requires reciprocal discovery, and, as we held in *People v. Superior Court (Mitchell), supra,* 5 Cal.4th 1229, a fair reading of section 190.3 was that it did *not* preclude reciprocal penalty phase discovery.

Second, the Attorney General argues that in order to challenge the court's denial of discovery on appeal, defendant was required to present its evidence in mitigation and suffer whatever rebuttal the prosecution might choose to present. He cites the rule, established in both federal and California courts, that the denial of a motion in limine to exclude a prior conviction offered to impeach a defendant or to limit the scope of cross-examination of a defendant is not reviewable on appeal unless the defendant actually testifies. (*Luce v. United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443, 105 S.Ct. 460]; *People v. Sims* (1993) 5 Cal.4th 405, 454–456 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People v. Collins* (1986) 42 Cal.3d 378, 383–388 [228 Cal.Rptr. 899, 722 P.2d 173]; see generally *People v. Rodrigues, supra,* 8 Cal.4th at pp. 1174–1176.) This is sometimes called the "*Luce* rule." He claims a similar rule should apply to this situation. We disagree.

Although there are some similarities between this situation and that giving rise to the *Luce* rule, the differences are greater than the similarities. The *Luce* forfeiture rule applies to in limine motions regarding the admissibility of evidence to impeach a testifying defendant. We summarized the reasons for this rule in *Rodrigues*: "First, without the precise factual context that such testimony would have provided, the appellate court cannot review the balance required to be drawn between the probative value and prejudicial effect of the prior conviction. [Citation.] Second, the trial court's in limine ruling is necessarily tentative because the court retains discretion to make a different ruling as the evidence unfolds. Also, when the defendant does not testify, there is no way to know whether the prosecutor ultimately would have used the prior conviction to impeach: if the prosecutor's case is strong and the defendant is impeachable by other means, the prosecutor might elect not to

use a questionable prior conviction. Thus, any possible harm stemming from the in limine ruling is ' "wholly speculative." ' [Citation.] Third, 'when the trial court errs in ruling the conviction admissible the reviewing court cannot intelligently weigh the prejudicial effect of that error if the defendant did not testify.' [Citation.] If such rulings were reviewable on appeal, ' "almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying." ' [Citation.] Finally, requiring a defendant to testify before the trier of fact in order to preserve his objections will also tend to discourage the making of motions in limine solely to 'plant' reversible error in the record in the event of conviction. [Citation.]" (*People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1174–1175, italics omitted.)

We also explained in *Rodrigues* that, "[i]n *Sims*, as in *Collins*, the trial court had no occasion to ascertain the *precise nature* of defendant's testimony because he elected not to testify; the court therefore had no basis for determining whether the probative value of the impeachment evidence would outweigh its prejudicial effect. [Citation.] Moreover, the alleged harm was wholly speculative and the defendant's tactical choice not to testify had thwarted our ability to judge the prejudicial effect of the asserted error." (*People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1175–1176.)

The ruling we are reviewing here was not an in limine evidentiary ruling but the denial of discovery. Much of the reasoning supporting the forfeiture rule is irrelevant to this situation. In ruling on, and reviewing, a discovery request, neither we nor the trial court have to be concerned with the difficulty of balancing probative value and prejudicial effect when the defendant does not testify. The record is fully sufficient to conclude the court here erred in denying discovery. The denial of discovery was not tentative, subject to change when the defendant testified, but final. Moreover, we are not greatly concerned that defendants will make discovery motions solely to plant error into the record. Some of the concerns regarding the difficulty of making a harmless error determination do apply here. In *Sims*, we quoted a federal court decision noting that when the defendant does not testify, " 'there is no reliable method for divining the genesis of defendant's decision not to testify. (Surely, self-serving statements by defense counsel are not enough to clear this hurdle.)' " (*People v. Sims*, *supra*, 5 Cal.4th at p. 456, quoting *U.S. v. Nivica* (1st Cir. 1989) 887 F.2d 1110, 1117.) Difficulties regarding making a harmless error determination do exist, but we do not think these difficulties alone warrant adopting the *Luce* rule in this situation.

To the extent defendant's tactical choice not to present the mitigating evidence, and thus not to risk unknown potential rebuttal, has thwarted a reviewing court's ability to judge the effect of error, this is because the denial

of discovery placed defense counsel into the untenable position of having to make an *uninformed* tactical decision. We have repeatedly said that "[t]he possibility of damaging rebuttal is a necessary consideration in counsel's decision whether to present mitigating evidence about the defendant's character and background." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1251 [275 Cal.Rptr. 729, 800 P.2d 1159]; accord, *In re Ross* (1995) 10 Cal.4th 184, 212 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) "Hence, a competent attorney . . . could prudently conclude that the risk of damaging rebuttal weighed against presentation of character and background in general." (*People v. Gonzalez, supra,* at p. 1251, fn. omitted.) However, we have also made clear that this decision must be reasonably *informed.* "[W]e see no basis in either law or reason to find defense counsel incompetent when he refrains from presenting mitigating evidence *as a result of an informed tactical decision,* so long as such decision is within the range of reasonable competence." (*People v. Miranda* (1987) 44 Cal.3d 57, 121 [241 Cal.Rptr. 594, 744 P.2d 1127], italics added.) This requirement presupposes that the information necessary to an informed decision will be available to defense counsel. As defense counsel argued at trial in this case, discovery of potential rebuttal evidence is necessary to an informed decision.

We have also repeatedly stated that "a criminal defendant's right to discovery is based on the 'fundamental proposition that [an accused] is entitled to a fair trial and an *intelligent defense* in light of all relevant and reasonably accessible information.' " (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84 [260 Cal.Rptr. 520, 776 P.2d 222], italics added, quoting *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305]; accord, *People v. Luttenberger* (1990) 50 Cal.3d 1, 17 [265 Cal.Rptr. 690, 784 P.2d 633].) Denial of discovery of potential rebuttal evidence thwarts defense counsel's ability to present an intelligent defense and to make an informed tactical decision whether to present mitigating evidence. The denial forced counsel to make an *uninformed, unintelligent* decision. We will not require defense counsel to make an uninformed decision in any particular fashion—i.e., force counsel to present the mitigating evidence and risk unknown rebuttal—in order to challenge on appeal the prosecution's and trial court's refusal to provide or order discovery.

Accordingly, the error is cognizable on appeal. We must decide whether it is prejudicial. Ordinarily, "to prevail on a contention made on appeal from a judgment of conviction on the grounds of violation of the pretrial discovery right of a defendant, the defendant must establish that ' "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." ' " (*People v. Bohannon* (2000) 82 Cal.App.4th 798, 806–807 [98 Cal.Rptr.2d 488].) However, here the error affected the penalty determination. The test for state law error at the penalty phase of a capital trial is whether there is a reasonable *possibility* the error

affected the verdict. (*People v. Brown* (1988) 46 Cal.3d 432, 446–448 [250 Cal.Rptr. 604, 758 P.2d 1135].) To the extent the denial of discovery implicated defendant's federal due process rights (see *Wardius v. Oregon, supra,* 412 U.S. 470), the applicable test is whether the error is harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) We have explained that "*Brown*'s 'reasonable possibility' standard and *Chapman*'s 'reasonable doubt' test . . . are the same in substance and effect." (*People v. Ashmus* (1991) 54 Cal.3d 932, 990 [2 Cal.Rptr.2d 112, 820 P.2d 214].)[6] Accordingly, we focus on the "reasonable possibility" test, but our conclusion applies equally to *Chapman*'s "reasonable doubt" test. (*People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

Under the circumstances, to find prejudice, we must find both (1) a reasonable possibility defense counsel would have presented the mitigating evidence had he received the discovery he requested (otherwise the error would not have affected the trial at all), and (2) a reasonable possibility the verdict would have been different had defendant presented the mitigating evidence.

As the Attorney General notes, three things occurred between the time that defense counsel first indicated he was considering presenting this mitigating evidence and his decision not to do so: (1) the court restricted the extent of Father Horan's testimony it would allow; (2) the court discussed the scope of rebuttal evidence it would permit; and (3) the court denied discovery of potential rebuttal evidence. In different parts of his brief, defendant contends each of these actions contributed to the decision not to present the mitigating evidence. So the precise question is to what extent, if at all, did the refusal to provide discovery contribute to the decision not to present the evidence. This is difficult to quantify, but we think it is reasonably possible defense counsel would have presented the evidence had he received the discovery he requested.

---

[6] The United States Supreme Court has also recognized the substantial equivalency of the reasonable possibility and reasonable doubt formulations. In a pre-*Chapman* opinion, the high court stated the harmless error test this way: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." (*Fahy v. Connecticut* (1963) 375 U.S. 85, 86–87 [11 L.Ed.2d 171, 84 S.Ct. 229].) In *Chapman,* the high court noted that "[t]here is little, if any, difference between our statements in *Fahy v. Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California, supra,* 386 U.S. at p. 24.) Accordingly, the court said it did "no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Ibid.*)

Defense counsel presented similar mitigating evidence at the first penalty trial; that the first penalty trial ended in a mistrial supports the inference he wanted to do so at the second trial. Moreover, he specifically stated he needed the discovery to make an informed decision whether to present the evidence. Finally, the record indicates that counsel had good reason to fear the unknown. The Attorney General argues that defense counsel effectively did know what rebuttal evidence the prosecutor possessed. At the first trial, held about three months before the denial of discovery at issue here, the prosecutor did offer rebuttal evidence. The Attorney General suggests that it was unlikely the prosecutor had generated additional significant evidence to offer in rebuttal during the three-month interim. However, when the prosecutor went out of his way to state that he did not have to provide discovery of his potential rebuttal evidence, and thereafter steadfastly refused to provide it, he strongly suggested he was withholding something substantial. It is indeed possible that the prosecutor possessed nothing new, but even so, defense counsel could reasonably have feared the prosecutor was refusing to disclose his rebuttal evidence for a reason.

In *People v. Pinholster* (1992) 1 Cal.4th 865, 941 [4 Cal.Rptr.2d 765, 824 P.2d 571], we found the failure to provide timely discovery harmless partly because there was "no suggestion that the defense would have been different had defendant been aware of [the belated discovery] before trial." Here, there is a strong suggestion that the defense *would* have been different. Under the circumstances, we conclude it is reasonably possible counsel would have presented the mitigating evidence if he had received the discovery he requested and to which he was entitled.

We also find a reasonable possibility the verdict would have been different had defendant presented the proffered mitigating evidence. Although the crime here was egregious, a death verdict was not a foregone conclusion. Indeed, the first penalty trial ended with a hung jury. The aggravating evidence of defendant's other crimes (possession of an assault weapon, two assaults on inmates, and possession of a shank in jail), although serious, was not overwhelming. Father Horan's proffered evidence regarding the ability of persons to change was not very compelling, but defendant presented similar evidence in mitigation at the first penalty trial and obtained a hung jury. The main difference between the two trials was that defendant presented mitigating evidence at the first trial that he did not present at the second trial. Under the circumstances, we find it reasonably possible the verdict at the second trial would have been different had defendant presented similar mitigating evidence at the second trial.

## III. Conclusion

We affirm the judgment as to guilt and the special circumstance but reverse the death sentence.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 23, 2006. Corrigan, J., did not participate therein.