Filed 5/3/13  P. v. Davila CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B239117 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. KA090972) |
| GILBERT JOSEPH DAVILA et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Douglas Sortino, Judge.  Affirmed as modified.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant Gilbert Joseph Davila.

Lynne Patterson for Defendant and Appellant Saul Gutierrez.

Law Offices of Walter R. Urban and Walter R. Urban for Defendant and Appellant Miguez Angel Suarez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

I. INTRODUCTION

A jury convicted defendants Gilbert Joseph Davila, Saul Gutierrez and Miguel Angel Suarez of two counts of attempted willful, deliberate and premeditated murder (Pen. Code,[1] §§ 664, 187, subd. (a)) committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The jury found each defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)). Defendants each were sentenced to life in state prison plus a consecutive 3-year term. We modify Mr. Davila's presentence custody credit. We affirm the judgments in all other respects.

## II. THE EVIDENCE

### A. The Prosecution Case

On June 9, 2010, an individual assaulted Gilbert Lopez, an El Monte Flores gang member. The assault occurred in an area controlled by the gang. Jonathan Temores, an associate of the gang, was with Mr. Lopez at the time. Jonathan[2] did not come to Mr. Lopez's aid. Three days later, Mr. Lopez died as a result of injuries sustained in the assault.

Jonathan's father, Jose Temores, Sr. (Jose Sr.) testified that after Mr. Lopez was assaulted, in the evening of that day, he received several telephone calls on a cellular telephone he shared with Jonathan. First, a male voice asked for Jonathan. Second, a male voice asked for Jonathan and told Jose Sr. "not to hide him." The third time, Jose Sr. heard only laughing. The fourth time, a male voice asked for Jonathan and told Jose

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] To avoid confusion, we refer to members of the Temores family by their first names.

Sr. "not to hide" Jonathan because "they would find him." After that, Jose Sr. stopped answering the telephone. On the following day, Jose Sr. received two more calls asking for Jonathan. The voices on each of the calls were different.

In the days following the assault on Mr. Lopez, Jose Sr. also received several text messages on the cellular telephone he shared with Jonathan. One message, in Spanish, said Jose Sr. "should bring . . . Jonathan out." A second text message, in English, also told Jose Sr. to "bring out Jonathan." A third message included a photograph of Mr. Lopez in the hospital. It said, "And you said this was your hommie, fucked up shit."

On June 10, 2010, defendants, who were also El Monte Flores gang members, went to Jonathan's home and asked for him by name. Jonathan's older brother, Jose Temores Jr. (Jose), said that Jonathan was not home. Defendants assaulted Jose. When Jonathan's and Jose's uncle, Felix Temores, came to Jose's assistance, defendants assaulted Felix.

Jose testified at trial that when he opened the door, he recognized Mr. Davila. Mr. Davila was wearing a black or gray and white striped shirt and a black hat with a fish and either an "M" or an "F" on it. Mr. Davila was standing about three feet away. Jose did not recognize the two men who were with Mr. Davila. The second male was standing approximately seven or eight feet away. A third male stood 15 to 17 feet away. Mr. Davila swung at Jose with a closed fist. When Jose swung back, Mr. Davila and the second male assaulted him with their fists. Jose estimated he was hit more than 10 times in the chest and head. He threw punches and kicked at his assailants in an effort to defend himself. Later, at the hospital, Jose identified Mr. Davila in a photographic lineup. Jose also identified Mr. Gutierrez as one of the assailants. He told Detectives Ralph Batres and Eduardo Nafarrate he was not 100 percent sure about it.

Felix heard a commotion and went to help Jose. He saw three males punching Jose. Felix joined the fight to help his nephew. Felix subsequently identified Mr. Suarez in a photographic lineup.

When she first heard the knock at the door, Jose's girlfriend, Yajaira Gonzalez, looked out and saw several Hispanic males in their twenties. Ms. Gonzalez was not able

3

to identify any of the attackers. At trial however, she described the person who knocked at the door as wearing a black hat with an "F" and a "swordfish" on it.

Felix's wife, Emily Puentes, was also present at the time of the attack. She testified at trial that she recognized all three defendants. She knew Mr. Davila's girlfriend. She had seen Mr. Davila many times prior to the night of the assault. Ms. Puentes testified Mr. Davila drove a blue Astro van. Ms. Puentes further testified she recognized the second man's face and knew his nickname, but she did not know his real name. She had seen him around the neighborhood. At trial, she identified Mr. Gutierrez as that second man. She had previously identified Mr. Gutierrez in a photographic lineup. Also at trial, Ms. Puentes identified Mr. Suarez as the third assailant. She knew his girlfriend Monica. She had seen Mr. Suarez around the neighborhood and knew him by his face and his nickname. Officer Batres testified Mr. Suarez had the name "Monica" tattooed on his wrist.

As the fight broke out, Ms. Puentes took the children who were in the home into a bedroom to keep them safe. When she returned, she saw Jose and Felix fighting with defendants. She testified, "It was hard to see who was fighting who." Ms. Puentes saw Mr. Davila and Mr. Gutierrez punching Jose. Mr. Suarez was punching Felix. The fight lasted only a few minutes.

Jose and Felix crawled back into the apartment as defendants were trying to push the door open. Family members struggled to close the door.

Jose and Felix sustained multiple stab wounds. Jose was stabbed in the left cheek and left shoulder. He was stabbed three times in the left side of his chest below his armpit. The shoulder wound required 16 stitches. Jose was hospitalized for five days. Felix was stabbed in his right hand, the right side of his torso, and his left chest. He lost a large amount of blood. The wound to his hand required 15 stitches. The wound to his torso required 10 stitches and 10 staples. Jose and Ms. Puentes both testified they never saw any weapons.

Jose was interviewed by law enforcement officers while hospitalized. Jose told Detective Batres it was Mr. Davila who stabbed him. He identified Mr. Gutierrez from a

4

photographic line-up. Jose said Mr. Gutierrez was the third male, the one who initially stood furthest from him. Jose thought Mr. Gutierrez had fought with Felix, but he was not 100 percent certain. While still hospitalized, Jose told Ms. Puentes he was sure that Mr. Gutierrez was one of the assailants. Felix, who was also hospitalized, identified Mr. Suarez from a photographic lineup.

On June 13, 2010, three days after the assault, Detective Batres and a partner searched a mobile home where Mr. Davila lived. Mr. Davila was not home, but Mr. Gutierrez was lying down in a bedroom in the home. Detective Batres did not recall seeing any physical injuries on Mr. Gutierrez's person. The detectives discovered a blue van on the property. As noted above, Ms. Puentes had told law enforcement officers that Mr. Davila drove a blue van.

Detective Batres, an experienced gang investigator, testified as a gang expert. He explained as follows. Gang members earn the respect of other gang members by being violent. If a gang associate or member fails to perform his duties, he will be "regulated," that is, disciplined, by the gang. It is important to a gang to discipline its members in order to maintain its status, a level of fear in the community, and the gang's ability to intimidate others. Gang members who participate in regulating one of their own gain individual status. The primary activities of the El Monte Flores gang were robbery, assault, witness intimidation, drug sales and murder. El Monte Flores gang members wear clothing signifying the gang. They wear baseball caps with the letter "M" or "F" on them. In response to a hypothetical question tracking the facts of this case, Officer Batres testified defendants went to Jonathan's house to "regulate" or "deal with" him for failing to defend their fellow gang member, Mr. Lopez. Defendants assaulted Jose and Felix because they were in the way; because violence and intimidation benefit the gang.


B. The Defense Case


Officer Victor Ruiz testified on Mr. Suarez's behalf. Officer Ruiz interviewed Ms. Puentes at the scene of the assault. Ms. Puentes said she recognized Mr. Davila as

5

one of the assailants. She described the second attacker as a Hispanic male, around 19 years old, five foot four to five foot six, with a "skinny" build. She said he was wearing a gray shirt and had a mustache. She was unable to describe the third suspect.

Detective Nafarratte testified on Mr. Davila's behalf. During the photographic lineup, Felix identified a man as the person who stabbed him. Mr. Davila's photograph was included in the lineup. But the man Felix identified was not one of the three defendants. Detective Nafarratte also testified Jose Sr. never contacted him about the telephone calls and text messages. Detective Nafarratte learned about them after meeting Jose Sr. by chance. Detective Nafarratte asked Jose Sr. for the telephone number associated with the calls and texts. Jose Sr. said his wife had deleted the information.

Mr. Davila and Mr. Suarez presented alibi witnesses. Mr. Davila's girlfriend, Tiffany Ortiz, testified Mr. Davila was with her all day and evening, until 11 p.m., on the date of the assault. Adrian Enriquez testified Mr. Suarez was at Mr. Enriquez's home from 3:45 p.m. through the night in question until the next morning.

## C. The Jury's Verdict

The prosecution's theory of the case was as follows. Mr. Gutierrez and Mr. Davila assaulted Jose. When Felix came to Jose's aid, Mr. Suarez assaulted Felix. Because Felix suffered stab wounds, Mr. Suarez must have been armed with a knife. The trial court struck the personal weapon use enhancement allegations (§ 12022, subd. (b)(1)) as to Mr. Davila and Mr. Gutierrez. The court also struck the great bodily injury enhancement allegations (§ 12022.7, subd. (a)) against Mr. Davila and Mr. Gutierrez as to Felix and against Mr. Suarez as to Jose. The jury found: Mr. Davila and Mr. Gutierrez personally inflicted great bodily injury on Jose; and Mr. Suarez personally inflicted great bodily injury on Felix. The jury found the personal weapon use enhancement allegation (§ 12022, subd. (b)(1)) as to Mr. Suarez to be *not true*.

6

# III. DISCUSSION

## A. Substantial Evidence Supported the Attempted Murder Convictions

Defendants challenge the sufficiency of the evidence to support their attempted willful, deliberate and premeditated murder convictions. We view the evidence in the light most favorable to the prosecution and presume in support of the judgment every fact the jury could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919; *People v. Hatch* (2000) 22 Cal.4th 260, 272.) We find substantial evidence supported defendants' convictions.

"'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' [Citations.] Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. [Citation.] . . . [T]he aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state. [¶] . . . [A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.] . . . ." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117.)

"[T]he dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and

7

abettor of the other, who also acts in part as an actual perpetrator.  . . . . [A defendant's] guilt for *attempted* murder might be based entirely on his own actions . . . . [I]n a stabbing case, one person might restrain the victim while the other does the stabbing.  . . . [B]oth participants would be direct perpetrators as well as aiders and abettors of the other.  The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own.  It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*People v. McCoy, supra,* 25 Cal.4th at p. 1120.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citations.]  To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' [Citations.]  In addition, except under the natural-and-probable-consequences doctrine [citations], . . . the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating the commission of,' the crime in question.  [Citations.]  When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.]  Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.)  An attempted murderer need not personally have acted with willfulness, deliberation, and premeditation to be guilty as an aider and abettor. (*People v. Lee, supra,* 31 Cal.4th at pp. 621-628.)

"""'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.  The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable.  [Citation.]" [Citation.]  Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." [Citation.]' [Citations.]  A reasonable foreseeable consequence is a factual issue to be resolved by the jury who evaluate all the factual circumstances of the individual case.  [Citation.]" (*People v. Favor* (2012) 54 Cal.4th 868, 874.)

Under the natural and probable consequences doctrine as applied to attempted willful, deliberate, premeditated murder, the jury must find the attempted murder was a natural and probable consequences of the target crime, here assault.  (*People v. Favor, supra,* 54 Cal.4th at p. 872.)  The jury need not find that *premeditation* was a natural and probable consequence of the target offense.  (*Ibid.*)  "Because section 664[, subdivision (a) (664(a))] 'requires only that the attempted murder itself was willful, deliberate, and premeditated' [citation], it is only necessary that the attempted murder 'be committed by one of the perpetrators with the requisite state of mind.'  [Citation.]  Moreover, the jury does not decide the truth of the penalty premeditation allegation until it first has reached a verdict on the substantive offense of attempted murder.  [Citation.]  Thus, with respect to the natural and probable consequences doctrine as applied to the premeditation allegation under section 664(a), attempted murder—not attempted premeditated murder—qualifies as the nontarget *offense* to which the jury must find foreseeability.  Accordingly, once the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately determines whether the attempted murder was willful, deliberate, and premeditated.  [¶]  Under the natural and probable consequences doctrine, there is no requirement that an aider and

9

abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*People v. Favor, supra,* 54 Cal.4th at pp. 879-880.)

Based on the evidence before it, the jury could reasonably conclude as follows. The three defendants assaulted the two victims. Each aided and abetted the others by his acts. Defendants arrived together at the Temores home. Defendants intended to assault Jose and Felix after they answered the door and Jose told defendants that Jonathan was not at home. Defendants wanted to send a message that the gang would not tolerate behavior such as Jonathan's. They sought to instill fear in the community and maintain their ability to intimidate. They desired to enhance the gang's status and their individual reputations within the gang. Defendants each were direct perpetrators and aided and abetted each other in the fist fight in which they all engaged.

At least one of the defendants was armed with a knife. There was substantial evidence the person or persons who stabbed the victims had a specific intent to kill. "'[It] is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.'" (*People v. Avila* (2009) 46 Cal.4th 680, 702, citing *People v. Smith* (2005) 37 Cal.4th 733, 741.) Both victims were unarmed and suffered multiple stab wounds in vital body parts during unprovoked attacks. This was substantial evidence the assailant or assailants had a specific intent to kill. (*People v. Avila, supra,* 46 Cal.4th at pp. 701-702; *People v. Bolden* (2002) 29 Cal.4th 515, 561; *People v. Osband* (1996) 13 Cal.4th 622, 682.)

There also was substantial evidence the direct perpetrator or perpetrators of the attempted murders acted willfully, deliberately and with premeditation. Our Supreme Court has identified three basic categories of evidence found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity; (2) motive; and (3) manner of killing or attempted killing. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663;

10

*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) "'[T]he *Anderson* guidelines are descriptive, not normative. [Citation.]' [Citation.] They are not all required [citation], nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation. [Citation.]" (*People v. Gonzalez, supra,* 54 Cal.4th at p. 663.) Here, when defendants arrived at the Temores home, at least one of them was armed with a knife. The jury could reasonably infer the direct perpetrator or perpetrators had considered the possibility of a violent encounter from the outset. (*People v. Lee* (2011) 51 Cal.4th 620, 636; *People v. Elliot* (2005) 37 Cal.4th 453, 471; *People v. Steele* (2002) 27 Cal.4th 1230, 1250.) Defendants sought to "regulate" Jonathan for conduct that had occurred a day earlier, giving them time to reflect on their actions. They assaulted Jose when he answered the door and denied that Jonathan was present. They assaulted Felix when he came to Jose's aid. Defendants resorted to violence to send a message and advance their reputation in the community. They stabbed the unarmed victims multiple times in vital body parts. The victims suffered significant loss of blood and required extensive sutures. This was substantial evidence of premeditation and deliberation. (See *People v. Elliot, supra,* 37 Cal.4th at p. 471; *People v. Hughes* (2002) 27 Cal.4th 287, 371.)

Moreover, judged objectively, it was reasonably foreseeable a gang motivated assault would escalate to attempted murder. As noted above, "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina, supra,* 46 Cal.4th at p. 920.) Further, it is well established that "prior knowledge that a fellow gang member is armed is not necessary to support a defendant's

[attempted] murder conviction as an aider and abettor." (*People v. Medina, supra,* 46 Cal.4th at p. 921, citing *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056, *People v. Godinez* (1992) 2 Cal.App.4th 492, 501, fn. 5; *People v. Montano* (1979) 96 Cal.App.3d 221, 227, superseded by statute on another point as stated in *People v. Gibbs* (1983) 145 Cal.App.3d 794, 797; accord, *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1451.)

"'[A]lthough variations in phrasing are found in decisions addressing the doctrine . . . the ultimate factual question is one of foreseeability. [Citation.] Thus, '"[a] natural and probable consequence is a foreseeable consequence" . . . .' [Citation.] But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . ." [Citation.]' [Citation.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (*People v. Medina, supra,* 46 Cal.4th at p. 920.)

Here, defendants, members of a violent street gang, knowingly and intentionally participated in a planned, gang motivated assault that resulted in great bodily injury to two victims. The gang used violence to enhance its reputation and that of its members, and to instill fear in the community. The gang's primary activities included assault and murder. The jury could reasonably conclude the fact that a fellow gang member would be armed with a knife was reasonably foreseeable. The assault was motivated by a desire to enhance the gang's reputation for disciplining its own members and for violence generally. Defendants arrived unannounced at the Temores residence dressed in gang attire. They assaulted the unarmed victims. The attack continued as the victims attempted to retreat into the apartment. Given these facts, the jury could reasonably conclude a gang member in defendants' position would have or should have known escalation of the confrontation from a fistfight to assault with a knife was reasonably foreseeable. (See *People v. Medina, supra,* 46 Cal.4th at pp. 919-928; *People v. Ayala, supra,* 181 Cal.App.4th at pp. 1447-1453; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 7-11; *People v. Montes, supra,* 74 Cal.App.4th at pp. 1054-1056; *People v. Olguin* (1994)

12

31 Cal.App.4th 1355, 1376; *People v. Godinez, supra,* 2 Cal.App.4th at pp. 499-500; *People v. Montano, supra,* 96 Cal.App.3d at p. 227.)

B.  There Was No Error or Abuse of Discretion in Admitting Jose Sr.'s Testimony About Cellular Telephone Calls and Texts

As noted above, Jose Sr. testified that in the days following the assault on Mr. Lopez, he received several telephone calls and text messages on a cellular telephone he shared with his son Jonathan.  One text included a photograph of Mr. Lopez in a hospital bed.  It was accompanied by the following statement:  "And you said this was your hommie, fucked up shit."  Jose Sr. further testified that as a result of the telephone calls and text messages, he feared for his son's life; further, Jonathan was afraid to come to court.  There was no evidence as to the source of the calls or the texts.  There was no evidence connecting any of the three defendants with the calls or the texts.

Prior to Jose Sr.'s testimony, the trial court instructed the jury as follows:  "You're about to hear testimony from Jose Temores Senior.  This testimony and any exhibits admitted during Mr. Temores testimony may be considered only for the following purposes:  to explain the absence of Jonathan Temores at this trial; as a basis for any expert opinion that may be rendered later in this trial by a police gang expert, and there is also going to be an exhibit admitted, an e-mail or text message which contains some language, that may be considered only for the purpose of explaining the belief of the sender of the e-mail whoever you may determine that sender to be.  [¶]  That e-mail, as well, may be considered as a basis for the expert opinion and also to explain the absence of Jonathan Temores.  [¶]  So the testimony of Mr. Temores Senior, as well as any exhibit admitted, including this e-mail, is for the following purposes only:  I'll say it again, to explain the absence of Jonathan Temores; as a basis for any expert opinion rendered by a police gang expert subsequent in this trial, and to explain the belief of the sender of the e-mail or the test message, whoever you may determine that sender to be.  You may consider it only for those purposes and you may give it whatever weight you

13

feel it deserves based upon all the evidence in this case and the instructions that I give you at the end." The trial court further advised the jury, "The e-mail or text message is not offered for the truth of the matter asserted, only for the belief of the sender, whoever you may determine that sender to be."

Defendants contend the evidence should have been excluded as more prejudicial than probative under Evidence Code section 352. Our review is for an abuse of discretion. (*People v. Eubanks* (2011) 53 Cal.4th 110, 144-145; *People v. Jablonski* (2006) 37 Cal.4th 774, 805.) We find no abuse of discretion.

"The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.] '[B]ecause motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; accord, *People v. McKinnon* (2011) 52 Cal.4th 610, 655.) The present evidence was offered not for the truth of the matter stated—that Jonathan said Mr. Lopez was his "hommie" or that something was "fucked up shit"—but as circumstantial evidence of defendants' gang related motive. (See *People v. McKinnon, supra,* 52 Cal.4th at p. 655; *People v. Gonzalez, supra,* 126 Cal.App.4th at p. 1550.) Further, the evidence was not "testimonial" within the meaning of *Crawford v. Washington* (2004) 541 U.S. 36, 68. (See *People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1221-1222.) Given that the calls were made and the texts were sent to Jonathan's cellular telephone number beginning on the day Mr. Lopez, his fellow gang member, was assaulted, that the callers told Jose Sr. not to hide Jonathan, and that one text impliedly accused Jonathan of abandoning Mr. Lopez, and aided by Detective Batres's expert opinion, the jury could reasonably conclude defendants' motive was to discipline Jonathan for what they believed was his failure to defend Mr. Lopez. In addition, Jose Sr. testified that as a result of the telephone calls and text messages, his son Jonathan was afraid to come to court. The telephone calls and text message were relevant to explain Jonathan's absence from the trial. (See *People v. Valdez* (2012) 55 Cal.4th 82, 135; *People v. Guerra* (2006) 37 Cal.4th 1067,

14

1141-1142, overruled on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) The probative value of the evidence was strong. It was not inflammatory or inherently prejudicial. The trial court did not abuse its discretion in allowing the evidence. Further, admission of the evidence did not render the trial so arbitrary and fundamentally unfair as to violate any defendants' federal due process rights. (See *People v. Jablonski, supra,* 37 Cal.4th at pp. 805, 807; *People v. Partida* (2005) 37 Cal.4th 428, 436.)

Mr. Davila argues the evidence should have been excluded as irrelevant. We disagree. Relevant evidence is "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) As discussed above, the evidence was relevant to explain why Jonathan was afraid to come to court, and was relevant circumstantial evidence of defendants' motive.

Mr. Davila further asserts the evidence of the cellular telephone calls and text messages was inadmissible bad character evidence under Evidence Code section 1101, subdivision (a). He asserts: "The introduction of [this evidence] clearly encouraged the jury to make unsupported assumptions and to draw negative inferences about [defendant's] character. By admitting this evidence, the trial court allowed the jury to speculate that [defendant] was associated with these unknown callers and unknown text senders and, thus, that [Mr. Davila] was guilty of making threats by this assumed association. The evidence further allowed the jury to speculate and to assume that [Mr. Davila] generally was a person of bad character." This argument is without merit. First, a trial court's Evidence Code section 352 ruling is reviewed under the reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Gonzales* (2011) 51 Cal.4th 894, 924; see *People v. Livingston* (2012) 53 Cal.4th 1145, 1162-1163.) In the present case, there was substantial evidence Mr. Davila was a member of a violent criminal street gang. Even if the trial court had erred in admitting evidence of the telephone calls and text messages, there was no prejudice to Mr. Davila. Second, at the time the evidence was introduced, the trial court carefully instructed the jury as to its limited uses. The jury was subsequently instructed: "During the trial, certain evidence

15

was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." The jury is presumed to have followed those instructions. (*People v. Pearson* (2013) 56 Cal.4th 393, 414; *People v. Alexander* (2010) 49 Cal.4th 846, 921.)

Even if the trial court erred in admitting the evidence, any error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 36; *People v. Watson, supra,* 46 Cal.2d at p. 836.) The evidence had strong probative value and minimal prejudicial effect. The jury was instructed as to its limited use.

## C. The Eyewitness Testimony Placing Defendants at the Scene was not Unreliable or Insufficient

Defendants challenge the out-of-court eyewitness identifications as physically impossible or inherently improbable. "Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585; accord, *People v. Young* (2005) 34 Cal.4th 1149, 1181.) Here, several witnesses positively identified defendants as the perpetrators. Ms. Puentes and Jose both recognized Mr. Davila when he came to the Temores's door. Jose testified Mr. Davila was wearing a black hat with a fish on it. Ms. Gonzalez could not identify the attackers. But she described one of them as wearing a black hat with an "F" and a "swordfish" on it. While hospitalized, Jose positively identified Mr. Davila as one of the assailants. (~RT 3:1278)~ Ms. Puentes recognized Mr. Gutierrez's face, but did not know his name. She knew his nickname. Jose identified Mr. Gutierrez as one of the perpetrators, but he was not 100 percent certain. Ms. Puentes identified Mr. Suarez. She knew him by his nickname. She knew him through his girlfriend, Monica. Mr. Suarez had the name "Monica" tattooed on his wrist. While hospitalized, Felix also identified Mr. Suarez. The identifications were neither physically impossible nor inherently improbable. Inconsistencies in the descriptions of the perpetrators and the circumstances under which

16

the identifications were made were credibility matters for the jury to resolve. There was no insufficiency of the evidence with respect to the eyewitness identifications. (*People v. Elliot, supra,* 53 Cal.4th at p. 585; *People v. Maury* (2003) 30 Cal.4th 342, 403.)

## D. The Expert Testimony Was Within Proper Limits

Mr. Davila argues the gang expert improperly opined on an ultimate issue in violation of Mr. Davila's due process and jury trial rights. Mr. Davila reasons that although Detective Batres was responding to a hypothetical question, it tracked the facts of the case, and led him to conclude El Monte Flores gang members went to the Temores home to "regulate" Jonathan. Mr. Davila did not raise this objection in the trial court. As a result, it has been forfeited. (Evid. Code, § 353; *People v. Waidla* (2000) 22 Cal.4th 690, 717; *People v. Williams* (1997) 16 Cal.4th 153, 250.) In any event, our Supreme Court has repeatedly held otherwise. (*People v. Xue Vang* (2011) 52 Cal.4th 1038, 1044, 1048-1050; *People v. Gonzalez* (2006) 38 Cal.4th 932, 946-947; *People v. Ward* (2005) 36 Cal.4th 186, 210; *People v. Gardeley* (1996) 14 Cal.4th 605, 618-620.) Defense counsel's failure to object to the gang expert testimony did not render his assistance ineffective. (See *People v. Gray* (2005) 37 Cal.4th 168, 208; *People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Hines* (1997) 15 Cal.4th 997, 1038, fn. 5.)

## E. There Was Substantial Evidence Supporting the Gang Enhancement

Mr. Davila argues there was insufficient evidence to support the gang enhancement. Section 186.22, subdivision (b)(1) states, "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he

17

or she has been convicted, be punished as follows . . . ." The jury found the gang enhancement allegations to be true.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60; accord, *People v. Livingston, supra,* 53 Cal.4th at p. 1170.)

The jury reasonably could conclude the attempted murders were committed for the benefit of the gang. Defendants were all members of the El Monte Flores gang, a criminal street gang within the meaning of section 186.22. Jonathan was an associate of the gang. In the immediate aftermath of the assault on a fellow gang member, Mr. Lopez, Jonathan's father began receiving messages on the cellular telephone he shared with his son. The callers asked for Jonathan and told Jose Sr. not to hide him, they would find him. They advised Jose Sr. to "bring [Jonathan] out." When defendants appeared at Jonathan's door, they were wearing clothing that signified their gang membership. Detective Batres explained defendants' presence. They sought to discipline Jonathan for failing to aid his fellow gang member, Mr. Lopez. In Jonathan's absence, defendants assaulted members of his family. It was important for them to do so in order to keep gang members in line, and to maintain the gang's status and the level of fear and intimidation in the community. Additionally, assaulting members of Jonathan's family served to elevate defendants' individual status within the gang. This was substantial

18

evidence supporting the gang enhancement.  (See *People v. Livingston, supra,* 53 Cal.4th at pp. 1170-1172;

F  The Judgment Must be Modified as to Mr. Davila's Presentence Custody Credit

The trial court awarded Mr. Davila 591 days of presentence custody credit plus 88 days of conduct credit.  However, Mr. Davila was in presentence custody for 599 days. "A defendant is entitled to actual custody credit for 'all days of custody' in county jail . . . ." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; accord, *People v. Morgain* (2009) 177 Cal.App.4th 454, 469; see *In re Marquez* (2003) 30 Cal.4th 14, 24-26.)  The judgment as to Mr. Davila must be modified to award 599 days of presentence custody credit plus 89 days of conduct credit (§ 2933.1, subd. (a)) for a total of 688 days.

G.  Cumulative Error

Defendants contend the cumulative effect of errors require reversal of their convictions.  We find no error and no cumulative prejudice.  (*People v. Pearson, supra,* 56 Cal.4th at p. 479; *People v. Williams* (2013) 56 Cal.4th 165, 201.)

19

## IV.  DISPOSITION

The judgment as to Mr. Davila is modified to award 599 days of presentence custody credit plus 89 days of conduct credit for a total of 688 days.  In all other respects, the judgments are affirmed.  Upon remittitur issuance, the clerk of the superior court is to prepare an amended abstract of judgment reflecting the modified presentence custody credit as to Mr. Davila and deliver a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


O'NEILL, J.*


We concur:


TURNER, P.J.


KRIEGLER, J.

---

*	Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20