Filed 2/25/14  P. v. Mears CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DARYL K. MEARS,<br><br>      Defendant and Appellant. | A136101<br><br>(Marin County<br>Super. Ct. No. SC173521A) |

## I.  INTRODUCTION

Daryl Mears was convicted of the second degree murder of Larry Robertson. (Pen. Code, § 190, subd. (a).)[1]  The jury also found true an enhancement allegation that Mears personally used a deadly weapon, a knife.  (§ 12022, subd. (b)(1).)  Mears was sentenced to a total prison term of 16 years to life in prison.  On appeal, Mears contends the judgment must be reversed because the trial court made several evidentiary and jury instruction errors and the prosecutor committed prejudicial misconduct.  We reject these contentions and affirm the judgment.

---

[1]  Unless otherwise noted, undesignated statutory references are to the Penal Code.

1

# II. STATEMENT OF FACTS

## A.     *The Prosecution Case*

### 1.     *Mears Stabbed Robertson*

On December 15, 2010, Mears encountered Robertson in a dark tunnel, stabbed him more than 60 times and then fled the scene. Two witnesses who knew both men testified about the details of the incident.

### a.     *Willie Smith*

Willie Smith was good friends with both Mears and Robertson. On December 15, 2010, he and Mears were together at an apartment complex in Marin City. Early that evening, they saw Robertson in the parking lot and said hello before Robertson got into a car with some friends and drove away. Then Mears said: " 'The next time I see him, I'm going to gut him.' " At the time, Smith did not think that Mears was serious about attacking Robertson.

After Robertson left, Smith and Mears walked to a convenience store in Sausalito which required them to travel through a long dark tunnel under the 101 freeway. On the way back from the store, as they approached the tunnel, they saw Robertson walking ahead of them toward Marin City. Mears, who was a few steps in front of Smith, pulled a knife and hid it behind his leg. The three men continued to walk toward Marin City without saying anything until they reached the middle of the tunnel. At that point, Mears said to Robertson, "I heard you have been snitching on me." Robertson responded: "I didn't say that. I just heard that." Then Mears said, "I'll gut you right now." Robertson did not make any verbal threat or give any response to this remark. Then Mears stabbed Robertson many times "[e]verywhere" on his body. Robertson did not have a weapon and Smith did not see him make any aggressive movement toward Mears before the attack began.

Initially, Smith was shocked by Mears's conduct; he froze and said nothing. However, at some point during the attack, he told Mears to stop, but Mears ignored him. At trial, Smith could not recall how many times Mears stabbed Robertson or where he stabbed him first. Smith testified that Robertson never said anything during the attack

2

and that when he fell to the ground, Mears did not stop. At some point, Mears did turn and walk a few steps away, but he returned and stabbed Robertson twice in the head. Then Mears and Smith ran away, toward a church in Marin City.

**b.    *Latanya Wiggins***

On December 15, 2010, at around 8:20 p.m., Latanya Wiggins and her husband drove through the tunnel toward Sausalito while on their way to dinner. Midway through the tunnel, Wiggins, who was sitting in the passenger seat, saw a man stabbing another man. Wiggins knew both Mears and Robertson, although she did not immediately realize they were the men involved in the stabbing incident.

Wiggins testified that she saw a man hunch over a person who was on the ground and repeatedly stab him, "just over and over and over again." She recognized the assailant, but did not immediately put Mears's name to the face. She told her husband to make a u-turn while she called 911. As they drove back into the tunnel, Mears was walking away, but he turned back and repeatedly kicked the man on the ground and then stabbed him in the head. Wiggins jumped out of the car and screamed, "What are you doing? Are you just going to stab him?" Before he ran off, the assailant looked right at Wiggins and she recognized him as Mears.

Wiggins and her husband approached the man on the ground, who was not moving and looked dead. Then he started to moan, pulled down the hood of his jacket, and Wiggins realized he was Robertson. He pleaded for help, saying he could not breathe. Wiggins testified that his cuts were "huge" and "his flesh was like hanging. It was really bad."

**2.    *Mears Fled the Scene***

When Marin County Deputy Sheriff Brenton Schneider arrived at the scene, bystanders pointed him in a northward direction where he found two suspects fleeing on foot. Smith complied with Schneider's command to stop and get on the ground. Mears, who was covered in blood, stopped about 15 to 20 feet away from the officer but he did not comply with commands to show his hands and get on the ground. Mears ignored additional commands as he pulled off his bloody sweatshirt and began walking toward

3

the officer, with his hands in his waistband. Twice he yelled "Shoot me. Just fucking shoot me." Then he turned and ran away, jumping a small fence that surrounded an apartment complex.

Meanwhile, Schneider's partner, Deputy Matelli, had arrived at the opposite side of the fence. He saw Mears climb the fence and told him to stop and get on the ground. Again Mears ignored the orders, and he repeatedly told the deputy to just shoot him. Eventually, Matelli used his taser to take Mears into custody. Mears had lacerations and a cut on his hand and another cut on his upper thigh. He was taken to the hospital where he was treated for his lacerations and for trauma and received stitches for his thigh wound.

### 3. *Robertson's Injuries Caused his Death*

Robertson was 5 feet, 10 inches tall and weighed around 300 pounds. The autopsy report documented 41 stab wounds and 27 incisions on his body.[2] One stab wound entered the body cavity at the abdomen. Although many of the other wounds were large and "widely gaping," they were classified as "superficial wounds," because they did not enter the body cavity or did not involve a major artery, vein or "nervous structure."

Evidence was presented at trial that multiple superficial wounds are life threatening, especially when they involve the scalp, as this set of injuries did. As the pathologist who performed Robertson's autopsy testified at trial, multiple superficial wounds cause massive trauma to the body, impair the "coagulation" function, and destroy the blood system of the body.

The cause of Robertson's death was the stab wound to the abdomen in association with the other stab wounds which, exacerbated by Robertson's obesity, led to "exsanguination," a loss of blood causing shock and cardiac arrest. As the testifying pathologist explained to the jury, "bleeding is a mechanism whereby death was produced. But the cause of death, ultimately, is the stab wound to the abdomen in association with all these other stab wounds, or you could say multiple sharp force injuries."

---

[2] An incision is a laceration which is longer than it is deep.

4

### 4. *Police Recovered Mears's Knife*

Police recovered a small serrated pocket knife from a trash can at the crime scene. Blood on the knife matched both Robertson and Mears.[3] At trial, Smith identified the knife as the weapon that Mears used to stab Robertson. He testified that the knife belonged to Mears, who had shown it to him a few weeks before the fatal attack. The pathologist who performed Robertson's autopsy confirmed that this knife could have caused the injuries that resulted in Robertson's death.

### C. *The Defense Case*

Mears testified on his own behalf, offering a very different version of his encounter with Robertson.

Mears told the jury that in 2010 he was living in Mill Valley where he had grown up. Earlier that year, he had been "involved" in "some automobile burglaries." When Mill Valley police questioned him about the crimes, Mears confessed and implicated others, including a man named Jeremy Weaver. During the interview, he told the officers that he was concerned about "[r]etaliation for snitching," but they told him that nobody would "get a hold of [his] testimony." Ultimately, Mears pleaded guilty to possession of stolen property and served a jail sentence.

Mears testified that after he was released from jail, he was "pursued by people in the community" who were mad at him "for snitching on my accomplice." Mears got into fights, and felt he had to sneak in and out of his home to avoid altercations. Mears also testified that he was "threatened" by as many as 15 people, one of whom was Robertson who threatened that "he was going to whoop my ass and get me when he could." Mears was concerned by this threat because he knew that Robertson was in a gang.

On the evening of December 15, 2010, Mears saw Robertson when he and Smith were walking to the store in Sausalito and they exchanged greetings. But, when they saw him a second time while walking back through the tunnel, Robertson confronted Mears

---

[3] A DNA analysis of 15 different blood stains on Mears's sweatshirt all belonged to Robertson. Blood stains on Mears's shoes matched both Robertson and Mears.

and accused him of "snitching on Jeremy Weaver." Mears denied that he had, but Robertson claimed he had "seen the paperwork." Mears responded by saying something like "Whatever. Do something about it," at which point the two men started fighting.

According to Mears, Robertson pulled out a knife and cut Mears across the leg. Mears slapped the knife out of his hand and was able to retrieve it, but then Robertson pulled it back, cutting Mears in the hand. Mears grabbed the knife a second time and was able to wrestle it away by punching Robertson in the face. Then Mears started stabbing Robertson "apparently a lot of times." Robertson fell to the ground and Mears recalled stabbing him again, but, he told the jury, "at that point, it gets like blurry, dark. . . . I didn't realize how many times I stabbed him, where I was stabbing him. I didn't realize about that, did not know any of that." Mears testified that he did not know why he stabbed Robertson "so many times," but recalled that he finally stopped because he heard Wiggins yelling at him. And then he left; he could not run, but he walked away.

Defense counsel asked Mears how he felt about causing Robertson's death. Mears offered the following response: "I feel horrible about it. But, also, I feel that his action caused my reaction. If he did not pull the knife and try to stab me, I wouldn't have got the knife from him and stabbed him back." Under cross-examination, the prosecutor asked whether it was Robertson's fault that Mears killed him. Mears said no, but testified that it was Robertson's "fault that he pulled the knife and tried to stab me." When pressed, Mears acknowledged that he "played a part" in Robertson's death because "I stabbed him," but Mears maintained that Robertson also played a part because he "pulled the knife," and, "If he did not pull the knife, I wouldn't have had to stab him." Mears testified that he was defending himself; that he acted in self-defense.

The prosecutor asked if Mears was acting in self-defense when he stabbed Robertson in the eye and the face and the back. Mears responded that he did not remember doing those things. Then the following exchange occurred:

"Q	What about when you walked away after stabbing him 50, 60, 65 times, walked away, turned around, came back and stabbed him in the head, is that still self defense?

6

"A No, I wouldn't say that was. I don't remember doing that. What I remember is Latanya yelling at me and then me leaving. . . .

"Q That wasn't my question. My question was, after you stabbed him over 65 times and you walked away from him, took five, six steps away from him, turned around, walked back and stabbed him in the head, were you acting in self defense?

"A No, that wasn't self defense, no."

After Mears completed his trial testimony, the defense recalled Deputy Schneider, who testified that Robertson had been identified as an "associate" of a criminal street gang in Marin City called the 200 Block Young Hogs. Under questioning by the prosecution, Schneider explained that an associate is somebody who "hangs out with other gang members" and that a person could be identified as such simply because he had been seen with a gang member. Schneider also testified that Robertson had never been identified as a gang member. Furthermore, Schneider had met Robertson in the past and considered him to be "one of the most respectful people in Marin City."[4]

## D. *Trial Proceedings*

The April 2012 jury trial was conducted before the Honorable Andrew E. Sweet. The prosecution theory at trial was that Mears committed first degree murder; that he killed Robertson out of anger because Robertson and other members of their "community" had been calling Mears a "snitch." During closing argument, the prosecutor emphasized that the evidence did not support Mears's claim of self-defense. Mears's testimony on that subject was not credible and was inconsistent with other witness testimony, the prosecutor asserted. Furthermore, Mears himself admitted that he was not acting in self-defense when he returned to Robertson's body and stabbed him twice more in the head.

The defense conceded Mears killed Robertson but disputed that he was guilty of murder. During his opening statement to the jury, defense counsel acknowledged that

---

[4] In its rebuttal case, the prosecution called witnesses who testified that Robertson was kind and gentle, that he was not violent and that he did not carry a weapon.

Mears stabbed Robertson approximately 70 times and that Robertson "died by reason of those stab wounds," but counsel argued that Mears did not commit a premeditated, deliberate act because he acted "out of fear and anxiety suffered by reason of being branded a government police informant . . . a snitch."

Thus, the defense theory developed at trial and articulated to the jury during closing argument was that Mears was guilty of voluntary manslaughter, both because he acted in the heat of passion and because he had an imperfect self-defense for the crime. During his closing argument, defense counsel maintained that the primary material dispute in this case pertained to "the intent element" of murder, and that the evidence bearing on that issue was largely "circumstantial." He urged the jury to "get past the gore and carefully analyze the evidence that bears on the intent element," and he argued this evidence did not support the allegation that Mears acted out of anger, but established instead that he acted out of "fear after being labeled a snitch."

Defense counsel also maintained that Mears's own testimony established that he thought he was defending himself, even if that belief was unreasonable. Counsel argued that Mears's admission at trial that he was not attempting to defend himself when he walked away and then turned back and stabbed Robertson in the head was not relevant because those injuries did not cause Robertson's death. As counsel explained: "But then that's not the stab that caused the death. As the Doctor testified, those were superficial wounds to the head and face. The bad damage had already been done. So when he walks away and comes back, that does not prove he had intent or malice or was acting deliberately. It just shows that he was befuddled. He was confused. He was enraged. He was impassioned and he killed somebody that he should not have."

On May 2, 2012, the jury was instructed regarding the law of first degree murder, second degree murder and voluntary manslaughter, received special verdict forms for each of these three offenses, and began its deliberations. On May 7, the jury returned a verdict finding Mears guilty of second degree murder.

# III. DISCUSSION

Mears purports to advance six distinct claims of trial court error and he argues that he is entitled to have these claims considered in the order he presents them in his appellate briefs. Indeed, Mears complains in his reply brief that the People have created unnecessary confusion and mischaracterized his claims by reorganizing appellant's arguments, and then responding to them in a different order than the claims were raised. From our perspective, the issues addressed in Mears's appellate briefs are not logically ordered. Thus, we decline to follow that pattern, although we do address all of his substantive claims of error.

## A. *In Limine Rulings*

Mears challenges two evidentiary rulings the trial court made when resolving the numerous pre-trial motions that were filed in this case. We review these rulings under the abuse of discretion standard of review. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 [admission or exclusion of evidence reviewed for abuse of discretion]; (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506 [same standard applies to expert evidence].)

### 1. *Medical Malpractice Evidence*

#### a. *Background*

Prior to trial, the prosecution filed a motion to exclude evidence of medical malpractice. At a hearing on that motion, the prosecutor explained that allegations had been made that the emergency room doctors who treated Robertson did not follow proper "protocols," and if those protocols had been followed, Robertson may not have died. The primary allegation that had surfaced was that a CT scan could have revealed the extent of the internal injury caused by the stab wound to Robertson's abdomen and led to a different course of treatment.

The defense opposed the prosecutor's motion. Defense counsel argued that the medical treatment Robertson received was relevant to the issue of intent. As counsel explained, "It's not so much what happened to him at the hospital but the depth configuration and natures of these wounds [were] relevant on the intent element. When

9

you stab somebody one way, you could intend to kill them. When you stab somebody another way, maybe you didn't."

The trial court asked defense counsel to clarify "what about what happened or did not happen at [the hospital] is relevant to this case and why." Defense counsel responded that he was "reluctant to discuss the specifics of [his] thought processes on that subject," but he acknowledged that the failure to perform a CT scan was not relevant and he agreed not to mention it. After further discussion, defense counsel reiterated that the nature of the stab wounds and what the doctor did to "repair the vast majority of them could be indicative of an intent other than an intent to kill."

Ultimately, the trial court ruled that evidence of possible medical malpractice was excluded. The court reasoned that death is a foreseeable consequence of inflicting 67 to 72 stab wounds on a person and, therefore, under any conceivable scenario, the defendant's conduct was a concurrent cause of death. Furthermore, the court found that any relevance of the possible "mess-ups at the hospital" was outweighed by the factors set forth in Evidence Code section 352. However, the court clarified that it was not excluding evidence regarding the nature of Robertson's wounds, including their depth, configuration and location. As the court explained, "I think it is admissible how superficial—there is death, also—but how superficial these wounds were and what it would take to repair them." The court also stated that it was willing to reconsider its ruling regarding the malpractice evidence if either side presented it with any additional information.

###### b. *Analysis*

Mears contends the trial court's in limine ruling was error because evidence of malpractice was relevant and admissible to show a potential intervening cause of Robertson's death.

" 'If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. [Citations.]' " (*People v. Scott* (1997) 15 Cal.4th 1188, 1215 (*Scott*); see also *People v. McGee* (1947) 31 Cal.2d 229, 240, 243.) The only exception to this rule is that "grossly improper"

10

medical treatment "may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause. [Citations.]' [Citation.]" (*Scott, supra*, 15 Cal.4th at p. 1215.)

In the present case, the pathology evidence established that Mears's conduct was a cause of Robertson's death. Furthermore, the only evidence of medical malpractice was an allegation that Robertson was denied proper treatment because he did not receive a CT scan. As defense counsel appears to have conceded at trial, the failure to take a CT scan was not substantial evidence of grossly improper medical treatment. Even if we could be persuaded otherwise, that omission by the emergency room doctors was obviously a foreseeable consequence of rendering emergency treatment to a victim who suffered so many injuries during this extremely violent attack. Thus, as the trial court explained, there was no evidence which could lead a reasonable jury to conclude that the 72 stab wounds that Mears inflicted were not a concurrent cause of Robertson's death. Under these circumstances, the failure to give Robertson a CT scan was not sufficiently probative of a material issue to outweigh other factors including the possibility of confusing the jury and the time it would take to explore this collateral issue. Thus, the court did not abuse its discretion by excluding this evidence under Evidence Code section 352.

On appeal, Mears contends that the trial court's ruling was error because it deprived the defense of the "opportunity" to present evidence which could have established that malpractice was an "unforeseeable intervening cause" of Robertson's death. To support this theory, Robertson relies on authority holding that proximate cause is generally a question of fact for the jury to decide. (Citing *People v. Roberts* (1992) 2 Cal.4th 271, 320).

Mears's use of the word "opportunity" makes his argument patently vague. To the extent he is arguing the defense was entitled to a jury determination regarding whether the missing CT scan was an unforeseeable intervening cause of death, we disagree for reasons we have already explained. If, on the other hand, Mears is suggesting that he was deprived of the opportunity to prove that Robertson received some other medical

11

treatment for his injuries which was grossly improper, the record shows otherwise. The trial court was very clear and careful about the scope of its in limine ruling. The defense was expressly advised that the court would reconsider the issue if any additional evidence or information was presented to it.

Therefore, we reject Mears's contention that the trial court abused its discretion by excluding evidence that Robertson did not receive a CT scan as part of the treatment for the wounds that Mears inflicted.

### 2.     *Defense Expert Testimony*

#### a.     *Background*

Prior to trial, the defense filed a memorandum in which it made an "offer of proof" regarding expert testimony it intended to elicit from Gregory Lee, a "criminal justice consultant" who had previously worked for the Federal Drug Enforcement Agency. The offer consisted of a summary of Mears's account of his interactions with Mill Valley police when he informed on Jeremy Weaver in this prior automobile theft case peppered with snippets of Lee's opinions quoted from a report he (presumably) prepared.[5]

In its motion, defense counsel stated that "Mr. Lee will testify, in a nutshell, to 'Daryl's fears and experiences after being identified as a person who informed police about his accomplices . . . .' " The defense also advised the court that it would elicit Lee's opinion that "regardless of who started the fight, [Mears] 'had a good reason to fear for his safety . . . .' "

The defense proposed that Lee would offer his expert opinion not just about Mears's specific " 'fears and experiences,' " but also that "all informants, willing or unwilling, gang or non-gang, fear discovery and retaliation. He will reinforce through his experience that all this is real that it happens all the time, it's not just an urban myth, TV plot line, or isolated event." The defense argued that this expert testimony was relevant to explain Mears's mental state and to support his self-defense theory.

---

[5] The report is not included in the appellate record.

12

Prior to jury selection, the trial court made preliminary rulings on issues pertaining to the expert witnesses, including Mr. Lee. The court observed that evaluating whether Lee's opinions were admissible was premature until evidence was elicited that Mears was an informant and that he had been labeled a snitch. However, the court also opined that if those predicate facts were established at trial, it appeared that most of Lee's opinions would be excluded for one of two reasons.

First, Lee's opinions addressed matters of common experience. As the court explained, "I don't think that his report, which is a proffer, essentially, establishes that he would tell this jury anything beyond common experience [that] would need expert testimony. [¶] In other words, it's common experience that people who inform on others in a criminal context can be labeled snitches and can fear for retaliation. We don't need an expert to tell us that."

Second, Lee had also opined that the police acted inappropriately when they elicited and used information from Mears in the earlier criminal case. The court made a preliminary ruling that this opinion would be excluded under Evidence Code section 352. The court reasoned that Lee's opinion about police conduct in the earlier case was "not relevant to the charges here, what the police did, how they got him to give information about others, criminally, and the like, and it would be confusing to the jury and time consuming to have an entire corollary proceeding about whether or not and how and why and when and what the police did with Mr. Mears in that previous incident."

A few days later, during the hearing on in limine motions, the court asked defense counsel for a response to its preliminary ruling regarding Lee's expert testimony. Defense counsel argued that Lee's testimony was relevant and admissible because the fear a person experiences when he is labeled as a "snitch" is outside the common experience of the jury.

The trial court asked defense counsel to articulate what opinion[s] the defense intended to elicit from Lee. Counsel responded that Lee would testify that the Mill Valley police who handled Mears's prior case had put him in a position in which he was "justifiably afraid, justifiably in fear of his life . . . ." To explain this opinion, he would

13

describe what happened in the earlier case: Mears implicated Jeremy Weaver; the police promised to keep Mears's identity confidential; the police broke that promise; and Mears was left in the untenable position of fearing for his life and not having any governmental protection.

The trial court expressed continued concern about the ambiguous nature of defense counsel's characterization of Lee's opinion about the danger of snitching. As the court explained, if Lee intended to testify that this particular defendant had a reasonable fear, his opinion was "dangerously close to inadmissible expert testimony." On the other hand, the more general Lee made his opinion regarding the fear associated with being a snitch, the more closely he would address a matter of common experience that did not require any expertise.

Ultimately, the court reiterated its findings that (1) the danger and fear associated with being an informant in a criminal case was not the proper subject of an expert opinion, and (2) Lee's opinion regarding allegedly "nefarious" behavior by the police in the prior case was irrelevant and properly excluded under Evidence Code section 352. Thus, the court ruled that it would stand by its tentative ruling to exclude Lee's testimony, although, once again, without prejudice to reconsider the issue as the trial progressed.

### b. *Analysis*

To be admissible, expert opinion testimony must relate "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) The expert's opinion must also be based on matter that "is of a type that reasonably may be relied upon by an expert" in formulating an opinion on the subject to which his testimony relates. (Evid. Code, § 801, subd. (b).) "An expert, however, may not testify that an individual had specific knowledge or possessed a specific intent. [Citation.]" (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1513.) Furthermore, the trial court retains discretion to determine whether otherwise admissible expert testimony should be excluded under Evidence Code section 352. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 945 (*Gonzalez*).)

14

Applying these rules here, we find that the trial court did not abuse its discretion. The court made a preliminary ruling about the opinions expressed or implied in Lee's report. First, it found that Lee's opinion regarding the propriety of police conduct in the prior case was not only irrelevant but would be confusing and time consuming as it would require a collateral proceeding about what happened in the prior case. On appeal, Mears does not articulate any theory of relevancy about this aspect of Lee's opinion or indeed even question the trial court's Evidence Code section 352 ruling.

Second, the court found that Lee's opinion that a person who informs in a criminal case puts himself at risk would likely not be admitted for several reasons. First, the jury did not need expert testimony to understand that fact. Second, the opinion the defense proposed to elicit from Lee was too vague to determine whether testimony on that subject was even potentially admissible; if Lee tailored his opinion to address Mears's *actual* state of mind when the incident occurred, it would be inadmissible (see *Garcia, supra*, 153 Cal.App.4th at p. 1513); if his opinion was too general, it would become a matter of common experience that would not be useful to the jury. (Evid. Code, § 801, subd.(a).)

On appeal, Mears ignores the circumstances suggesting that Lee intended to offer an improper opinion regarding Mears's actual state of mind. Instead, he makes the more general claim that expert evidence about the dangers of being an informant was relevant to explain Mears's state of mind and would have assisted the jury in "understanding the magnitude" of the risk associated with being a snitch. To support this claim, Mears relies primarily on *Gonzalez, supra,* 38 Cal.4th 932.

In *Gonzalez, supra,* 38 Cal.4th 932, the defendant was convicted of murdering two members of a rival gang. To establish that the defendant was the shooter, the prosecution relied on eyewitness identifications that were repudiated at trial. The prosecutor also presented evidence that the defendant told a fellow gang member that he was the shooter, which was also repudiated at trial. (*Id*. at p. 939.)

On appeal, the *Gonzalez* court rejected an argument that the trial court erred by admitting testimony from the prosecutor's gang expert that a gang member who is called to testify against a fellow gang member would likely be the subject of intimidation from

15

both his own gang as well as a rival gang. (*Gonzalez, supra,* 38 Cal.4th at p. 945.) The court found that this expert opinion was relevant because it would assist the jury in deciding which version of the witness testimony was truthful, the "initial" identifications or the "later repudiations." (*Id.* at p. 946.) The court also found that the gang expert's testimony "was quite typical of the kind of expert testimony regarding gang culture and psychology that the court has discretion to admit." (*Id.* at p. 945.)

As the *Gonzalez* court explained, the question "[w]hether members of a street gang would intimidate persons who testify against a member of that or a rival gang is sufficiently beyond common experience that a court could reasonably believe expert opinion would assist the jury." (*Gonzalez, supra,* 38 Cal.4th at p. 945.) To support this conclusion, the court cited several cases in which " 'expert explication' " had been necessary in order to help the jury understand a " 'subculture in which this type of mindless retaliation promotes "respect." ' [Citations.]" (*Id.* at pp. 945-946.)

Mears contends that *Gonzalez* is relevant and supports his claim of error in this case because it illustrates that "[e]xpert testimony regarding criminal subcultures has been routinely admitted in gang cases." We agree that *Gonzalez* is pertinent but not in the way Mears contends. The *Gonzalez* trial court admitted expert testimony about gang culture at a jury trial for a gang retaliation crime. Here, in contrast to *Gonzalez*, there was never any allegation by either side that this was a gang retaliation crime and, indeed, it does not appear that Lee had any intention to testify about gang subculture. Nevertheless, *Gonzalez* is relevant to our analysis because it confirms our conclusion that even if Lee's expert opinion was not per se inadmissible, the trial court retained the discretion to exclude it. (*Gonzalez, supra,* 38 Cal.4th at p. 945.)

Here, the trial court exercised its discretion in a different way than the *Gonzalez* trial court did and for materially different reasons. It precluded an expert from testifying that (1) informants in criminal cases always face a real danger of retaliation; (2) this defendant reasonably feared for his life when he committed the acts that gave rise to the charges against him; and (3) the Mill Valley police mistreated this defendant in a *different* criminal case. As just explained, Mears does not dispute that Lee's opinion

16

about the conduct of the Mill Valley police was not admissible. Furthermore, Lee could not properly render any expert opinion about what Mears actually felt or believed (i.e., his state of mind) when he killed Robertson. Thus, the only remaining question is whether the trial court abused its discretion by precluding Lee from offering the general opinion that all criminal informants face a real threat and danger of retaliation.

For the reasons outlined above, we believe the trial court acted within its discretion. Our conclusion is reinforced by several additional considerations, including that (1) Lee's actual report is not a part of the appellate record; (2) the court's ruling was preliminary in nature and we find no indication that Mears ever attempted to clarify or refine the expert opinions it intended to elicit in a way that addressed the trial court's valid concerns; and (3) the trial court's ruling was made without prejudice, and Mears's trial counsel did not revisit the issue after the prosecution completed its case or Mears testified regarding his version of the events.

Furthermore, if excluding expert testimony regarding the magnitude of the risk of snitching was error, it was harmless. In this regard, Mears contends that the issue of his "mental state" was "close" and that it is reasonably likely he would have been convicted of manslaughter if his testimony had been accompanied by Lee's expert opinion. We conclude it is not reasonably likely the jury would have resolved this case in a manner more favorable to Mears had it heard Lee's expert testimony. (See *People v. Watson* (1956) 46 Cal.2d 818, 834.)

The prosecution never disputed that an informant in a criminal case faces a real and serious threat of retaliation. Rather, the dispute in this case was whether this particular defendant *actually* feared for his life *when* he encountered Robertson in the tunnel. In other words, the prosecution's theory was not that Mears had no objective reason to fear retaliation from snitching but, rather, that Mears subjectively acted out of malice aforethought rather than fear when he encountered Robertson in the tunnel, pulled his own knife out and proceeded to stab the unarmed victim more than 60 times.

## C. *Defense Motion for Mistrial*

### 1. *Background*

Prior to trial, the defense filed a motion to preclude the prosecutor from referring to Robertson as a "victim" until closing argument. (Citing *People. v. Williams* (1860) 17 Cal. 142, 147.) The defense argued that this term "implies a legal conclusion about defendant's guilt, and subverts the presumption of innocence." At the hearing on in limine motions, defense counsel reiterated that the word "victim" was inappropriate until closing argument because "There's no victim until the jury says there's a victim." Over the prosecutor's objection, the trial court granted the motion out of an "abundance of caution."

During the prosecutor's opening statement to the jury, she referred to Robertson as the "victim" three times. After opening statements were concluded, Mears's trial counsel moved for a mistrial "based upon a willful violation" of the court's in limine ruling. Defense counsel argued that there was "no possibility" that the violation was inadvertent or accidental and that the only remedy was to "start over."

The prosecutor responded that she made an "inadvertent mistake." By way of explanation, the prosecutor stated that she had never before been "ordered not [to] refer to the victim as the victim." She apologized to the court and counsel, stated she had no intention of violating the court's order and opined that the defense had not been prejudiced.

The trial court denied the motion for a mistrial. The court found that there was no prejudice to the defense because (1) the "vernacular" that the prosecutor used to refer to the deceased was not likely to have any impact on the jury's decisions in light of the nature of the allegations in the case; and (2) instructions the court gave just prior to the opening statements guarded against potential prejudice by advising the jury that the attorneys' statements were not evidence and that they should not to be swayed by sympathy, bias or prejudice. The court also found that the prosecutor's use of the term "victim" was "inadvertent and unintentional."

18

## 2. *Analysis*

Mears contends that the prosecutor's "repeated disobedience" of the in limine order deprived him of a fair trial. (Capitalization omitted from quote.)

First, we reject Mears's factual characterization of the prosecutor's conduct. The trial court found that the prosecutor's use of the term "victim" was inadvertent, not disobedient. We will not second-guess that finding which was made by the judge who personally observed the opening statements.

Second, we question whether Mears forfeited this claim of error by failing to request an admonition after the mistrial motion was denied. "[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury." (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Here, Mears argues that it would have been futile to request an admonition because the trial court had already essentially found that a curative admonition was unnecessary by alluding to the pre-instructions it had given prior to the opening statements. We disagree.

The trial court did find that the instructions guarded against potential prejudice. However, it did not expressly or implicitly refuse to give an additional curative admonition. Rather, it was defense counsel who expressed the view that the only "remedy possible" was a mistrial. Once that view was rejected, it appears that defense counsel made the reasonable tactical decision not to request an additional admonition which could have highlighted the issue for the jury.

Third, if this claim of error is preserved for appeal, Mears fails to establish that the trial court erred by finding that a mistrial was not required. " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' " (*People v. Jennings* (1991) 53 Cal.3d 334, 380.) Here, Mears fails to support his assumption that the prosecutor's characterization of Robertson as a victim was incurably prejudicial.

19

In the trial court, the defense relied solely on *People v. Williams, supra*, 17 Cal.4th 142. That case involved an improper jury instruction which described the decedent as a victim in a case in which the defendant claimed self defense. (*Ibid*.) Here, this label was used by the prosecutor, not the trial court, and, although the prosecutor was wrong to violate the in limine ruling, the jury had just been instructed that statements by counsel were not evidence and that it should not be influenced by sympathy, bias or prejudice.

On appeal, Mears also relies on *People v. Vance* (2010) 188 Cal.App.4th 1182. In that case, the prosecutor committed prejudicial misconduct by inviting the jury to "put itself in the victim's position and imagine what the victim experienced" when he was killed. (*Id*. at pp. 1188, 1192-1198.) Nothing comparable to that happened in this case.

Finally, even if the trial court erred by failing to give an additional admonition or even to grant the motion for a mistrial, the error was harmless. " 'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. [Citation.]' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010.) Under the circumstances established here no such reasonable probability exists.

**D.    *Causation Jury Instructions***

Mears contends the jury instructions were fatally flawed because they did not properly instruct the jury regarding the causation element of the homicide offenses.

**1.    *Background***

During the trial, the parties each filed requests for jury instructions. The trial court used those requests to compile its own set of instructions which it proposed to give, subject to revisions based on counsels' objections and arguments. After conducting a hearing to consider those objections and arguments, the court settled on the jury instructions that it used in this case.

**a.    *CALCRIM No. 520***

The trial court used CALCRIM No. 520 to instruct the jury regarding the elements of murder with malice aforethought. CALCRIM No. 520 states, among other things, that the People have the burden of proving that: "1. The defendant committed an act that

caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; [¶] AND [¶] 3. He killed without lawful excuse or justification."

CALCRIM No. 520 also includes detailed definitions of express and implied malice. However, in giving this instruction, the trial court did not include optional bracketed paragraphs from the pattern instruction which elaborate on the causation element of a murder charge. Those paragraphs state:

"[An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.]

"[There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.]"

At the hearing on jury instructions, defense counsel objected to giving CALCRIM No. 520 on the ground that there was insufficient evidence of premeditation or malice aforethought. The trial court overruled that objection. The defense did not object that the trial court should include the optional bracketed paragraphs from the pattern instruction that address causation or indeed make any comment about causation when this instruction was discussed.

### b. *CALCRIM No. 240*

The trial court did not instruct the jury with CALCRIM No. 240, notwithstanding that this instruction was included on the list of instructions requested by the defense.

CALCRIM No. 240, which is titled "Causation," states that an act causes an injury if the injury "is the direct, natural, and probable consequence of the act" and the injury "would not have happened without the act." This pattern instruction defines a natural and probable consequence as "one that a reasonable person would know is likely to happen if

21

nothing unusual intervenes" and advises the jury to consider "all the circumstances established by the evidence" when deciding this question.

CALCRIM No. 240 also includes a bracketed optional paragraph to be used in cases involving multiple potential causes of injury which states that an act is a cause of injury only if it is a "substantial factor" in causing the injury, and which defines substantial factor as "more than a trivial or remote factor," but not necessarily the only factor that causes the injury.

At the hearing on jury instructions, the trial court made a preliminary ruling not to give CALCRIM No. 240, but then inquired whether the defense wished to be heard on the matter. Defense counsel responded: "No, I believe it should be given, but I'm not going to belabor the point." The prosecutor stated that she did not think the instruction should be given. Then the court made the following ruling: "All right. For the reasons we discussed in limine, the causation instruction, I think, is not appropriate in this case and will not be given."

### c.     *CALCRIM No. 620*

The trial court did not instruct the jury with CALCRIM No. 620, notwithstanding that this instruction was also requested by the defense.

CALCRIM No. 620, which is titled "Causation: Special Issues," states, in part: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

CALCRIM No. 620 also contains a bracketed optional paragraph to use in cases involving medical malpractice which states: "[The failure of the (doctor(s)/ [or] medical staff) to use reasonable care in treating _____ <insert name of decedent> may have contributed to the death. But if the injury inflicted by the defendant was a substantial factor causing the death, then the defendant is legally responsible for the death even though the (doctor[s]/ [or] medical staff) may have failed to use reasonable care. On the other hand, if the injury inflicted by the defendant was not a substantial factor causing the death, but the death was caused by grossly improper

22

treatment by the (doctor[s]/[or] medical staff), then the defendant is not legally responsible for the death.]"

When CALCRIM No. 620 was addressed at the hearing on jury instructions, the trial court stated: ". . . again, a causation instruction. I don't think it's appropriate given our previous discussion. Do you wish to be heard further?" Both the defense counsel and the prosecutor declined to argue the issue and, therefore, the court ruled that this instruction would not be given.

**2.** *Analysis*

Mears contends the trial court erred by refusing to instruct the jury with the two CALCRIM causation instructions that he requested. Mears also complains that the trial court should have included the bracketed optional paragraphs contained in CALCRIM No. 520, because they would have focused the jury's attention on the specific question of what act or acts were substantial factors in causing Robertson's death.

Mears argues that he was entitled to these instructions under one if not two principles of law. First, the trial court has a sua sponte duty to instruct on issues " ' "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) Second, a criminal defendant is entitled to an instruction pinpointing his defense theory. (See, e.g., *People v. Burney* (2009) 47 Cal.4th 203, 246 (*Burney*).)

However, the trial court's sua sponte obligation to instruct on general principles of law applies only to principles that are " ' "relevant to the issues raised by the evidence." ' " (*Breverman, supra,* 19 Cal.4th at p. 154.) By the same token, although the defendant does generally have a right to an instruction that pinpoints the theory of the defense, the trial court may properly refuse such an instruction if it is not supported by substantial evidence. (*Burney*, *supra,* 47 Cal.4th at p. 246.)

Here, as we have already explained, there was no substantial evidence that medical malpractice was an intervening cause of Robertson's death. Thus, to the extent medical

malpractice was a defense theory in this case, that unsupported theory did not entitle Mears to any special causation jury instruction, whether he requested it or not.

On appeal, Mears contends that malpractice was not the only causation issue in this case. In fact, Mears takes the position that causation was a disputed issue at this trial because it directly related to the defense claim that Mears did not "harbor malice" when he inflicted the fatal stab wound to Robertson's abdomen. Under this theory, Mears inflicted two distinct sets of injuries on Robertson. The first set of injuries that Mears inflicted before he turned to walk away the first time, which included the fatal knife wound to Robertson's abdomen, were inflicted without malice because Mears was overcome by passion and fear. By contrast, Mears argues, when Mears returned to Robertson's "supine" body and kicked and stabbed him in the head, he may have been acting with malice, but those acts did not cause Robertson's death.

Mears argues that this mens rea defense to the murder charge gave rise to a sua sponte duty to instruct the jury regarding the law of proximate cause because it made causation a crucial disputed issue at trial. (Citing *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 590-591 ["[a] failure to instruct upon the element of proximate causation where that matter is in issue constitutes error. [Citation.]"].)

As reflected above, the jury in this case was instructed with CALCRIM No. 520 regarding the prosecutor's burden of proving that Mears caused Robertson's death. On appeal, Mears does not dispute that instruction correctly states the law. Instead, what he is really arguing is that CALCRIM No. 520 was too general or incomplete to adequately instruct on causation in light of his mens rea defense. However, "[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

Here, the mens rea argument that Mears advances in his appellate briefs was not the basis upon which he sought special causation jury instructions. Indeed, characterizing this argument as a defense theory seems misleading. As best we can determine, this issue about whether Mears had two different types of intent during the stabbing incident in the

24

tunnel arose during closing arguments to the jury in the context of an argument about the impact of Mears's admission that he was not acting in self-defense when he inflicted the final two stab wounds in Robertson's head.[6]  In any event, the issue clearly was not raised in connection with the jury instructions that were requested or debated during trial.

Furthermore, the element that is targeted by this new mens rea theory is intent not causation; the argument concedes that Mears inflicted all of the knife wounds, including the allegedly fatal wound, but disputes that Mears *intended* to kill *when* he inflicted the allegedly fatal wound to the abdomen.  Contrary to Mears's arguments on appeal, this precise issue was adequately addressed by the jury instructions in this case.  Specifically, the jury was instructed with CALCRIM No. 251, which states:  "The crime charged in this case requires proof of the union or joint operation, of act and wrongful intent.  [¶] For you to find a person guilty of the crime charged in this case or any lesser offense or to find the allegation of personal use of dangerous or deadly weapon true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state.  The act and the specific intent or mental states required are explained in the instructions for that crime or allegation."  In addition, CALCRIM No. 520 reiterated for the jury the required nexus between act and intent by instructing that the prosecution had the burden of proving that Mears "committed an act that caused the death of another person," and that "[w]hen the defendant acted, he had a state of mind called malice aforethought."

---

[6]  At times during his lengthy argument, Mears actually attributes this mens rea theory to the prosecutor.  For example, he contends he was entitled to special causation instructions "in order to rebut the prosecution's mens rea argument" that, when Mears returned to Robertson and stabbed him twice in the head after walking away, he acted with malice which "could not be explained away as heat of passion or a fugue state."  This version of Mears's argument mischaracterizes the prosecution's theory.  The prosecutor did not contend that the two final stab wounds to the head caused Robertson's death.  Instead, she argued that Mears's admission that he was not acting in self defense when he returned to Robertson's body was evidence that he was never acting in self defense.

25

Mears contends that additional causation instructions were necessary to ensure that the jury did not mistakenly conclude that Mears's mental state when he inflicted "superficial wounds on the supine Robertson" was sufficient to establish that he acted with malice when he inflicted the fatal wound earlier during the fight in the tunnel. But he fails to explain how the causation instructions he now finds so vital would have provided the jury with useful guidance on this issue, especially in light of the fact that the defense never disputed that Mears caused Robertson's death. Indeed, that concession was made during the defendant's opening statement to this jury. Furthermore, because Mears continues to misconstrue an intent issue as a causation issue, he overlooks the pertinent instructions that addressed this aspect of Mears's argument.

CALCRIM No. 251 instructed this jury that murder is a specific intent crime; CALCRIM No. 520 further instructed that the specific intent required to prove murder is malice aforethought, and that malice aforethought "is a mental state that must be formed before the act that causes death is committed." Thus, if the jury had been persuaded by the defense theory that Mears harbored a fundamentally different mental state when he inflicted the first 66 knife injuries than he did when he inflicted the final two, then the instructions that the jury received in this case would have required the jury to find that Mears was not guilty of murder.

For all these reasons, we reject Mears's claim that the trial court failed to properly instruct the jury regarding the causation element of the charged offense.

## E. *CALCRIM No. 370*

The trial court instructed the jury regarding the potential relevance of evidence of a motive by giving a version of CALCRIM No. 370 which stated: "The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

On appeal, Mears contends this motive instruction was irrelevant. He reasons that (1) motive evidence is relevant to prove the identification of the perpetrator, but (2)

26

identity was not a disputed issue in this case. However, Mears's own authority establishes that motive evidence is potentially relevant to a panoply of issues, not just identification. (*People v. Gonzales* (1948) 87 Cal.App.2d 867, 877-878.) "It is settled that evidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person to commit the homicide, and thus to solve a doubt either as to the identity of the slayer, the degree of the offense, the insanity of the accused, or the justification or excusability of his act, is admissible, however discreditably it may reflect upon the defendant, and even where it may show him guilty of other crimes. [Citations.]" (*Id.* at pp. 877-878.)

Here, the prosecution produced substantial evidence that Mears intentionally killed Robertson because he was angry at him for calling him a snitch. This motive evidence was relevant and admissible to rebut Mears's claim of self-defense. (See, e.g., *People v. Hall* (1938) 27 Cal.App.2d 440, 446.) Thus, CALCRIM No. 370 was not irrelevant.

Alternatively, Mears contends that CALCRIM No. 370 was inappropriate and misleading because he produced evidence that he was motivated by fear and passion, but this pattern instruction "does not acknowledge that 'motive' evidence may affirmatively point to innocence when it tends in reason to negate malice." Mears forfeited this claim of error by failing to raise it in the trial court. In any event, it lacks merit.

CALCRIM No. 370 is a correct statement of the law. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 942.) Mears does not dispute this fact. Thus, he is not complaining about what CALCRIM No. 370 says, but rather what it does not say. However, if Mears believed that the motive evidence in this case tended to negate the malice element of the charged offense, it was incumbent on him to request an instruction pinpointing this special theory. (See, e.g., *People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489.) No such instruction was requested. Indeed, as just noted, the issue was never even raised in the trial court.

## IV. DISPOSITION

The judgment is affirmed.

27

_____
Haerle, Acting P. J.


We concur:


_____
Richman, J.


_____
Brick, J.*


    * Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.